Opinion
 

 MOSK, J.
 

 This cause involves an appeal, which is automatic, from a judgment including a sentence of death against Tauno Waidla. A separate cause involves a similar appeal from a similar judgment against Peter Sakarias.
 
 (People v. Sakarias
 
 (2000) 22 Cal.4th 596 [94 Cal.Rptr.2d 17, 995 P.2d 152].)
 
 [1]
 

 I.
 
 Procedural History
 

 On November 28, 1988, on behalf of the People of the State of California, the District Attorney of the County of Los Angeles presented an information to the superior court thereof against Waidla and Sakarias, accusing them of various felonies committed during the preceding summer. As subsequently illuminated by the evidence, the information—which was pleaded, according to custom, in the conjunctive
 
 (In re Bushman
 
 (1970) 1 Cal.3d 767, 775 [83 Cal.Rptr. 375, 463 P.2d 727])—is to the following effect.
 

 
 *704
 

 In count 1,
 
 the district attorney charged that Waidla and Sakarias murdered Viivi Piirisild in the home that she shared with her husband Avo Piirisild in North Hollywood. To make them subject to the penalty of death, he alleged that they committed the murder under the special circumstances of felony-murder robbery and felony-murder burglary. To enhance any noncapital sentence that they might receive, he alleged that, in committing the murder, they personally used a deadly and dangerous weapon in the form of a knife. For the same purpose, he similarly alleged that, in committing the murder, they personally used a deadly and dangerous weapon in the form of a hatchet.
 
 In count 2,
 
 he charged that, in the same incident, they robbed her at home. Among his allegations were separate ones for sentence enhancement against both men, one for personal use of a deadly and dangerous weapon in the form of a knife, the other for personal use of a deadly and dangerous weapon in the form of a hatchet.
 
 In count 3,
 
 he charged that, also in the same incident, they burglarized the home. Here, as above, his allegations included separate ones for sentence enhancement against both men, one for personal use of a deadly and dangerous weapon in the form of a knife, the other for personal use of a deadly and dangerous weapon in the form of a hatchet.
 
 In count 4,
 
 he charged that, in an earlier incident, they burglarized a cabin that the Piirisilds owned in Crestline in San Bernardino County.
 
 In count 5,
 
 he charged that they fraudulently obtained telephone services.
 
 In count 6,
 
 he charged that they concealed, sold, and withheld stolen property that they took from the cabin.
 
 In count
 
 7, he charged that Sakarias alone committed grand theft by taking an automotive vehicle.
 

 Waidla and Sakarias (see
 
 People v. Sakarias, supra,
 
 22 Cal.4th at p. 609) each pleaded not guilty to the charges, and denied the allegations.
 

 Subsequently, the superior court found that Sakarias was not mentally competent to stand trial, and suspended criminal proceedings against him alone. (See
 
 People
 
 v.
 
 Sakarias, supra,
 
 22 Cal.4th at p. 616.) It severed Waidla’s and Sakarias’s cases, and allowed Waidla’s to go forward.
 

 Trial of Waidla was by jury. After the guilt phase, by its verdicts and findings, the jury found him guilty of the following felonies under the following special and other circumstances: murder in the first degree against Viivi, under the felony-murder-robbery and felony-murder-burglary special circumstances, with the personal use of a deadly and dangerous weapon in the form of a hatchet but not a knife; robbery in the first degree against her, again with the personal use of a deadly and dangerous weapon in the form of a hatchet but not a knife; burglary in the first degree as to the Piirisilds’ home, yet again with the personal use of a deadly and dangerous weapon in the form of a hatchet but not a knife; burglary in the first degree as to their
 
 *705
 
 cabin; fraudulently obtaining telephone services; and sale of stolen property. After the penalty phase, by its verdict, it fixed the punishment for Viivi’s murder at death instead of a term of imprisonment for life without possibility of parole.
 

 The superior court rendered judgment against Waidla accordingly, sentencing him to death for Viivi’s murder and also to a term of imprisonment for each of the other felonies, whose execution it stayed, totaling 18 years.
 

 Later, having found that Sakarias had recovered mental competence, the superior court reinstated criminal proceedings.
 
 (People
 
 v.
 
 Sakarias, supra,
 
 22 Cal.4th at p. 617.) Trial was by jury. (See
 
 id.
 
 at p. 615.) After the guilt phase, the superior court apparently dismissed the charge of grand theft. (See
 
 id.
 
 at p. 608.) Thereupon, the jury found him guilty of the same felonies, under the same special and apparently other circumstances, as had Waidla’s jury with respect to Waidla. (See
 
 ibid.)
 
 After the penalty phase, it fixed the punishment for Viivi’s murder at death. (See
 
 id.
 
 at pp. 608-609.) The superior court rendered judgment accordingly, sentencing him to death for her murder and also to a term of imprisonment for each of the other felonies, whose execution it stayed, totaling 18 years.
 
 (Ibid.)
 

 II.
 
 The Facts
 

 At the guilt phase, the People introduced evidence, including a confession that Waidla made to the police, to prove to the jury that he was guilty beyond a reasonable doubt of all of the felonies charged under all of the special and other circumstances alleged, including first degree murder both on a theory of willful, premeditated, and deliberate murder and also on theories of felony-murder burglary and felony-murder robbery.
 

 Avo and Viivi Piirisild were bom in the Baltic state of Estonia. In 1951, they came to the United States. They subsequently married, and had a single child, their daughter Rita. They were active in the Baltic American Freedom League, a volunteer organization whose purposes included securing the independence of the Baltic states of Estonia, Latvia, and Lithuania, which were then occupied by the former Union of Soviet Socialist Republics. They owned a home in North Hollywood and a cabin in Crestline. By the time pertinent here, Rita had grown to adulthood, left home, and married, taking her husband’s surname Hughes, and living with him in the general area.
 

 Around April of 1987, Avo and Viivi met Waidla and Sakarias. It appears that Viivi was then vice-president and secretary of the Baltic American Freedom League, and that Avo had formerly been its president. According to
 
 *706
 
 evidence including testimony that he himself would give bearing on his background and character, Waidla was born in Estonia apparently in 1967, and was reared there; he was conscripted into the Soviet Army, an altogether brutal environment, in 1986; he was sent to what was then East Germany for basic training; he ended up in a military hospital; once there, he met Sakarias, himself an Estonian conscript, who was assigned to drive a paramedic vehicle; they decided to desert; they left one night under the cover of darkness; after completing a journey of about three days, they crossed the border into what was then West Germany; apparently together with Sakarias, Waidla asked for, and received, political asylum, and sought, and obtained, permission to go to the United States; also apparently together with Sakarias, Waidla arrived in New York City in January of 1987, to the welcome of the Estonian-American community there, and arrived in due course in Los Angeles in April of 1987, to the welcome of the Estonian-American community
 
 there.
 
 Both Waidla and Sakarias spoke and understood English. Of the two, Sakarias was more outgoing and outspoken, Waidla less so.
 

 After meeting Avo and Viivi around April of 1987, Waidla and Sakarias moved into an apartment close to their home. Viivi invited them to dinner, and they accepted. Soon thereafter, she arranged for Waidla to interview for a position as a translator with the Voice of America in Washington, D.C.; he went there, something unfortunate apparently happened, and he returned about a week later.
 

 Later in the spring of 1987, at Viivi’s suggestion, Avo invited Waidla to move into their home—Viivi had told Avo, “He has no where [sic] to go, so we have to help him.” Waidla accepted. He moved in immediately. In the time that followed, Avo and Viivi would take him with them to their cabin. They provided him with room and board; they also saw to his other needs, including clothing, medical care, cigarettes, etc. He got a little bit of money from other sources—for example, he sold to a Canadian newspaper an article that he wrote, and Viivi helped translate, relating to his flight with Sakarias from the Soviet Army to the West; he took some photographs for the Baltic American Freedom League; and he did various odd jobs. He expressed no interest in finding work or in furthering his education; indeed, he expressed an interest in
 
 not
 
 doing so: Not only did he make no effort on his own behalf, he even frustrated efforts made by others, including Avo and Viivi, as by remaining only a week at a job that they had gotten for him and by refusing to cooperate in obtaining a scholarship that they had attempted to arrange. He indicated a desire to get money—but without working. So too did Sakarias, with whom he continued to associate when he was able, Sakarias moving from place to place around the country. As Waidla and Sakarias themselves told Rita, they “wanted to get rich quickly,” and discussed “living on the beach in Hawaii and traveling all around the world making
 
 *707
 
 money and living the high life”; but they “didn’t want to be working stiffs”; they “frowned upon” the “American work ethic”; and they “felt that they were treated better financially in Estonia,” where, Sakarias said, a person could obtain “government money because the government was so corrupt.”
 

 In the summer or fall of 1987, Avo asked Waidla to do certain construction and related work in and around the Piirisilds’ home in order to cover his room and board, and not for pay; Waidla agreed. Without Avo’s knowledge, Viivi promised to give Waidla, who did not have a driver’s license, a nonrunning Triumph Spitfire sports car belonging to Avo for his transportation needs if he should get a job or enroll in school. On learning of the promise, which he thought was conditioned on Waidla’s completion of the work in question, Avo expressed displeasure, apparently to both Viivi and Waidla, but agreed’to abide by its terms.
 

 By the fall of 1987, Viivi began to express an interest in paying for all of Waidla’s and Sakarias’s educational and perhaps other expenses if they wished to attend college. She expressed this interest to Waidla and, apparently, Sakarias, and to others as well. Evidently, neither Waidla nor Sakarias had such a wish. On one occasion, when she spoke of the matter, Waidla simply rolled his eyes. On the same occasion, she indicated a concern that he was being influenced—negatively, it appears—by Sakarias.
 

 By mid-May of 1988, Waidla had become angry with Avo and especially Viivi, and also, apparently, with the Estonian-American community generally; he had become desperate for money; and he had begun to scheme to resolve matters in his favor. So too had Sakarias.
 

 In a letter dated May 14, 1988, and written to Sakarias, who was then evidently in or around New York, Waidla related (in Estonian, as subsequently translated) that he had “sent an application to the Munich Radio”— referring, apparently, to Radio Free Europe in Munich. “If you want, send one also. There they are looking for workers . . . (announcers).” He cautioned: “Look, don’t breath[e] about this to anybody, otherwise the same may happen what happened to me at V.O.A. When one jerk knows, then all know. This is the way of the expatriot [sic: for “expatriate”] Estonians. You know yourself just as well.” He added: “Generally my situation is shitty . . . (more than shitty).” “I do not believe that I can stand to stay here until end of June. I believe that if we cannot get to Germany for some reason, then we could do something together. Of course, ... we must get rid of those dammed
 
 [sic:
 
 for “damned”] Estonians for once finally. This is like the Mafia, only the likes of us are the normal Estonians. I believe that to [sic: for
 
 *708
 
 “we”?] know the language and we can get along without those jerks.” He continued: “I believe that maybe we should go to Hawaii. Of course, if we can get to Munich, then definitely to there. I have nothing against it if we could go skiing in the Alps or chase women in Monte Carlo. Next week I will sell this wheelbarrow”—an evident reference in slang to Avo’s Triumph. “I cannot do anything with it. I cannot obtain driver’s licenses
 
 [sic],
 
 since Viivi’s insurance apparently does not cover it. This is all, of course, bullshit, but that’s the way it goes, and in Germany or in Hawaii, one does not need an automobile.” He asked: “Listen, how can one purchase such license in New York? Can it be done this way, that I will send you money, a photo and a signature. I have not found such a place here, and I do not care to come to New York. Such a forged license can be easily exchanged in Hawaii or in Germany” “for a correct license.” He closed: “Write. What do you think of such plans?”
 

 In late May of 1988, in the presence of Rita, Viivi and Waidla had an angry encounter about construction work around the Piirisilds’ home. For the work that he had in fact completed, which was substantial, Waidla demanded Avo’s Triumph, put into running condition, or $4,000, which he apparently believed was its value, a demand that he had made some days earlier. Viivi refused: She stated, “No, you show no incentive to work or go to school, and therefore you can’t have the car or the money”; she added, “You’ve brought this topic up before, and I don’t want to hear about it anymore.” He threatened that, if he did not get what he demanded, he would report her to the building authorities for nonpermitted construction, a threat that he made some days earlier as well. She stated that he had brought up this topic too previously, and did not wish to hear about it again. She made out a list of the cost of his room and board and other needs, which amounted to between $10,000 and $15,000. He became angry, and said, “Everyone knows what kind of person you are all around town.” She responded, “Get packed and get out of here.” She made a telephone call to Avo. Waidla threatened that, if he did not get what he demanded, he would kill Avo or break his arm. Rita calmed Waidla down, gave him a sandwich and some soda, and told him to go peacefully and not to do anything to provoke Avo. With her help, he packed, and then left. Sakarias picked him up, and together they departed.
 

 After, if not before, Viivi and Waidla’s angry encounter, Viivi began to express fear of Waidla and Sakarias. She expressed such fear to a number of persons, including Avo and Rita and also George Charon, a Special Agent for the Federal Bureau of Investigation with whom she was acquainted.
 

 In addition, after, if not before, Viivi and Waidla’s angry encounter, Waidla and Sakarias found themselves cut off, at least in part, from the
 
 *709
 
 Estonian-American community and that community’s resources, and also from Estonians outside of the United States and
 
 their
 
 resources. According to testimony that Waidla himself would give, after the encounter he and Sakarias set out from the Los Angeles area in an automobile that Sakarias was driving; they went to Phoenix—from whose environs, apparently, they sent Viivi a postcard picturing a rattlesnake—then to Key West, Miami, New York City, Jersey City, and finally Boston; from Boston, they headed back to the Los Angeles area in a pickup truck that Sakarias contracted to deliver to San Francisco by a specified date for its owner; driving by turns, they arrived in the Los Angeles area. During the journey, again according to his own ensuing testimony, Waidla telephoned the Piirisilds several times in an effort to get Avo’s Triumph or the proceeds from its sale.
 

 On July 4, 1988, Waidla and Sakarias drove in the pickup truck to the Piirisilds’ home. They appeared at the front door unannounced. Avo and Viivi were within. Afraid, Viivi stayed out of sight inside the house. Avo went to talk to the pair outside. In the conversation that followed, Waidla and Sakarias told Avo that they had made a coast-to-coast-to-coast journey; they also told him that they had caused damage to the pickup truck in an accident, and that they had to deliver it soon to San Francisco. In the course of the conversation, Waidla announced to Avo that he had come to get Avo’s Triumph. Avo responded that he could not give him the automobile that day: The vehicle’s title documents, which were in a bank safety deposit box, were not accessible because the bank was closed for Independence Day, and the vehicle itself was not in running condition. Waidla apparently asked whether he could give him the automobile the next day. Avo answered that he could not: He had to leave on a business trip the following morning—as he actually did—and would not return for about two weeks—as he actually did not. Waidla commented that he did not know whether he would be back from the trip to San Francisco at that time. Displaying a bank book with a balance of $18, he added that he had no money and needed some for the trip. Avo stated that he did not have any cash on hand. Waidla said that he would pay him back. Avo stated, again, that he had no cash. Instead, he offered to purchase gasoline for the pickup truck by means of a credit card. Waidla and Sakarias drove Avo to a service station. Avo made the purchase. Waidla and Sakarias drove him back home. They then departed themselves.
 

 Between July 4 and 11, 1988, Waidla and Sakarias broke into and entered the Piirisilds’ cabin, which was unoccupied. As Waidla himself would testify in admitting the deed, they did not have much money. They stayed for some time, consuming food and drink and making telephone calls. Before they went off, with things in disarray, they took various items of the Piirisilds’ personal property, including a combination telephone/clock radio and a hatchet.
 

 
 *710
 
 On July 11, 1988, Waidla and Sakarias sold to a pawnbroker the combination telephone/clock radio that they had taken from the Piirisilds’ cabin, obtaining only $15 for the item.
 

 On July 12, 1988, while Avo was away on his business trip, and after Viivi left for a dental appointment, Waidla and Sakarias broke into and entered the Piirisilds’ home. Before doing so, they had been seen in the area by one of the Piirisilds’ neighbors walking towards the house, wearing jackets and not carrying bags, and displaying hard looks. On Viivi’s return, as she passed through the front door toward the living room, before she could even attempt to resist, Waidla and Sakarias set upon her, dispatched her toward death, and then dragged her to a bedroom where her body would subsequently be found. They
 
 throttled
 
 her, fracturing her larynx and hyoid bone;
 
 bludgeoned
 
 her several times about her head and face and neck with perhaps the butt of the head of a hatchet, delivering some blows with such force as to crush her skull, fracture her jaw and various facial bones with her teeth knocked back, and generally deform her features;
 
 chopped
 
 her three times around the top of her head perhaps with the edge of the head of a hatchet, delivering one blow with similar crushing, fracturing, and deforming force to penetrate her skull completely, delivering the other two blows with less force and, evidently, peri- or post-mortem; and
 
 stabbed
 
 her four times in the left chest area perhaps with a knife, inflicting two wounds that were six inches deep in the environs of vital organs, one that was three inches deep, and one that was only one-half inch deep and, evidently, peri- or post-mortem. They caused her death through the combination of the throttling, bludgeoning, chopping, and stabbing, and may have done so through any one of such means, because each was potentially fatal in and of itself. Before they went off, with things in disarray but apparently with their hands washed, they took various items of the Piirisilds’ personal property, including a purse, wallet, green jade earrings, black star sapphire pendant, and credit and telephone charge cards, all belonging to Viivi. After doing so, they were seen in the area by the same neighbor walking away from the house, now carrying bags and not wearing jackets, acting suspiciously. Within the house, near the place at which they had broken and entered, Waidla left behind his right thumbprint for later discovery. He could not have made the impression while he was living there up to about a month and a half earlier, because such an impression has a “life span” of only 10 days to three weeks. Apparently, he also left behind two cigarette butts. Tobacco smoking was not permitted in the house because Viivi was allergic to the fumes. Saliva on the butts matched Waidla’s, but not Sakarias’s.
 

 Later on July 12, 1988, Waidla and Sakarias sold to another pawnbroker the green jade earrings and the black star sapphire pendant that they had
 
 *711
 
 taken from Viivi at the Piirisilds’ home, obtaining only $20 for the items. With one of Viivi’s credit cards, they purchased two airline tickets for one-way travel from Los Angeles to New York City. They abandoned the pickup truck.
 

 On July 13, 1988, Waidla and Sakarias flew from Los Angeles to New York City. In the days that followed, they used Viivi’s credit and telephone charge cards to make various telephone calls and to purchase various items, including a substantial amount of fine jewelry and an airplane ticket that they unsuccessfully attempted to exchange for a cash refund. They traveled, together and separately, within the Estonian-American community and without. When asked by an Estonian-American acquaintance whether they had heard that Viivi had been murdered, they made no response, and turned to talk about the weather.
 

 On August 28, 1988, near the United States-Canada border in New York, a border patrol agent employed by the United States Immigration and Naturalization Service detained Waidla on suspicion of illegal entry into the country. Later that day, another border patrol agent detained Sakarias on the same basis at another location nearby. Seized from Sakarias was a very small amount of money, only 2 cents in American currency and 68 cents in Canadian. Seized from Waidla was a similarly small amount of money, only a few dollars in American currency and hardly anything at all in Canadian. Also seized from Waidla was a letter, dated August 26, 1988, that he had written to Sakarias, but had not sent, stating (in Estonian, as subsequently translated): “I am not sure, however, I hope that you will receive this letter sometime. At the last moment”—evidently turning back from suicide—“I did put the safety back on . . .the parabellum”—a kind of nine-millimeter semiautomatic pistol—“and I put” it “into the bag. What will come the future is unknown. Right now I am drinking Bavarian beer with the proper strength in one of the better class bars in Montreal. When you hear that I am dead, then you should know that I’ve coracked
 
 [sic:
 
 for “croaked”] with a weapon in hand. If you hear that I have been taken alive . . . (almost impossible) . . . then you should know that I did my best. However, generally you may look for me in Key West. This is a small place. You will find me. Of course, when my death notice will appear, probably there is no reason to look for me. However, . . . well. Generally you are my best friend . . . (possibly the only friend ever), so that it would be nice if we should meet again sometime. I wish you a firm hand and a cool nerve . . . .” In his own testimony, Waidla would admit that he had the “parabellum” in his possession when he was detained, and had it loaded.
 

 On August 29, 1988, Waidla made statements to the police, in the person of detectives employed by the Los Angeles Police Department. The next
 
 *712
 
 day, August 30, he made further statements to them and, ultimately, his confession. In his confession, he admitted participation in Viivi’s murder and the related burglary and robbery, but attempted to limit his involvement in the attack to a single bludgeoning blow delivered at its inception, and to expand Sakarias’s involvement to encompass all of the rest.
 

 For his part, Waidla introduced evidence to raise a reasonable doubt in the mind of the jury as to his guilt of each of the felonies charged under each of the special and other circumstances alleged. In summation, however, his counsel would argue that, if the jury did not entertain such a doubt, it should find him guilty of first degree murder on a theory of willful, premeditated, and deliberate murder only, and not on a theory of either felony-murder burglary or felony-murder robbery.
 

 Taking the stand in his own behalf, Waidla, among other things, denied any participation in Viivi’s murder and the related burglary and robbery, asserting as an alibi that he had left the Los Angeles area three days earlier to hitchhike to New York alone without Sakarias. He recanted his confession. He stated that he merely parroted back a story that the police schooled him in. He stated further that he did so because they threatened to hang him if he did not, and had persuaded him that they would follow through, since they behaved like interrogators of the Komitet Gosudarstvennoy Bezopasnosti or KGB, the erstwhile Soviet “Committee for State Security,” into whose hands he said he had fallen in Estonia. He presented evidence, including the testimony referred to above spanning his birth in Estonia to his arrival in Los Angeles, bearing on his background and character. He also relied on evidence that the People presented, including his article on his flight with Sakarias from the Soviet Army to the West, bearing on the same matter.
 

 At the penalty phase, the People declined to introduce any further evidence. Relying on guilt phase evidence for aggravation, they urged the jury to fix the punishment for Viivi’s murder at death.
 

 Having introduced, or not opposed, evidence of his background and character at the guilt phase in anticipation of the penalty phase, Waidla likewise declined to introduce any further evidence. Relying on such guilt phase evidence for mitigation, which included no prior felony convictions and no other crimina] activity involving the use or threat of force or violence, he urged the jury to fix the punishment for Viivi’s murder at a term of imprisonment for life without possibility of parole.
 

 
 *713
 
 III.
 
 Discussion
 

 A.
 
 Issues Relating to Guilt and Eligibility for the Penalty of Death
 

 Waidla raises a number of claims against the determination of guilt and eligibility for the penalty of death. As will appear, none is meritorious.
 

 1.
 
 Conduct of Voir Dire of Prospective Jurors
 

 Section 223 of the Code of Civil Procedure provides, among other things, that, “[i]n a criminal case,” the trial court has “discretion in the manner in which” it conducts the voir dire of prospective jurors. (Code Civ. Proc., § 223.) But it also provides that, in all such cases, including those involving the death penalty, the trial court must conduct the voir dire of “any prospective jurors . . . , where practicable, ... in the presence of the other” prospective “jurors . . . .”
 
 (Ibid.)
 
 In doing so, it “abrogates”
 
 (Covarrubias v. Superior Court
 
 (1998) 60 Cal.App.4th 1168, 1171 [71 Cal.Rptr.2d 91]) the holding of
 
 Hovey v. Superior Court
 
 (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], wherein we “declare[d], pursuant to [our] supervisory authority over California criminal procedure, that in future capital cases that portion of the voir dire of each prospective juror which deals with” his views on the death penalty “should be done individually and in sequestration”
 
 (id.
 
 at p. 80, fn. omitted).
 

 Waidla moved the superior court to conduct the voir dire of the prospective jurors concerning their views on the death penalty individually and in sequestration, in accordance with
 
 Hovey.
 
 The superior court denied the motion. In setting out its reasons, it stated that section 223 of the Code of Civil Procedure “abrogated”
 
 Hovey,
 
 under the provision’s terms, it had the authority to conduct individual and sequestered voir dire in the “exercise” of its “discretion”; except in areas that were “sensitive in nature,” it chose not to do so; it believed that individual and sequestered voir dire was simply not “necessary in this case”; it also believed that it had “fulfill[ed]” any “policy” underlying individual and sequestered voir dire by obtaining from each prospective juror, on its order, a completed 25-page questionnaire answered in writing under penalty of perjury, wherein he expressed, inter alia, his “opinion on the death penalty,” “individually” and “in private.”
 

 Waidla contends that the superior court erred under California statutory law by denying his motion to conduct the voir dire of the prospective jurors concerning their views on the death penalty individually and in sequestration, in accordance with
 
 Hovey.
 

 An appellate court applies the abuse of discretion standard of review to a trial court’s granting or denial of a motion on the conduct of the voir
 
 *714
 
 dire of prospective jurors. (See Code Civ. Proc., § 223.) A trial court abuses its discretion when its ruling “fall[s] ‘outside the bounds of reason.’ ”
 
 (People v. Ochoa
 
 (1998) 19 Cal.4th 353, 408 [79 Cal.Rptr.2d 408, 966 P.2d 442], quoting
 
 People v. DeSantis
 
 (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)
 

 Employing that test, we find no error. The superior court’s denial of Waidla’s motion to conduct the voir dire of the prospective jurors concerning their views on the death penalty individually and in sequestration, in accordance with
 
 Hovey,
 
 was not unreasonable. We shall assume that the superior court might have conducted the voir dire as requested. But we cannot conclude that it had to do so. The reasons that it set out for its ruling were altogether reasonable. Devoting but a handful of words to the issue, Waidla makes essentially no argument to the contrary. We shall not endeavor to make one on his behalf.
 
 [2]
 

 2.
 
 Overruling of Challenges for Cause Against Prospective Jurors
 

 Waidla challenged five prospective jurors for cause: Dorothy Gelles, Beatrice Martinek, Fred English, Brent Weston, and Darrow Bruck. The superior court overruled each challenge. The jury that was eventually sworn and impaneled included Bruck, but not Gelles, Martinek, English, or Weston. When it was sworn and impaneled, Waidla had peremptory challenges remaining against its members and made no objection to its composition.
 

 Waidla contends that, by overruling his challenges for cause against Prospective Jurors Gelles, Martinek, English, and Weston, and then Prospective Juror Bruck, the superior court erred under the impartial jury trial clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment. Under the Sixth Amendment’s impartial jury trial clause, the “crucial question is ‘whether the [prospective] juror’s views [on the death penalty] would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ ”
 
 (People v. Clair
 
 (1992) 2 Cal.4th 629, 653, fn. 2 [7 Cal.Rptr.2d 564, 828 P.2d 705], quoting
 
 Wainwright v. Witt
 
 (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d
 
 *715
 
 841], quoting in turn
 
 Adams v. Texas
 
 (1980) 448 U.S. 38, 45 [100 S.Ct. 2521, 2526, 65 L.Ed.2d 581].)
 

 We reject the claim at the threshold. To preserve a point based on the overruling of a challenge for cause against a prospective juror, a defendant “must either exhaust” his “peremptory challenges and object to the jury as finally constituted” at trial, or else “justify” his “failure to do so” on appeal.
 
 (People v. Kirkpatrick
 
 (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248]; accord,
 
 People v. Lucas
 
 (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Waidla did not exhaust and object below, nor does he justify here.
 

 We also reject the claim on the merits. An appellate court applies the abuse of discretion standard of review to a trial court’s sustaining or overruling of a challenge for cause against a prospective juror. (Cf. 2 Childress & Davis, Federal Standards of Review (2d ed. 1992) Trial Judge: Supervision and Discretion, § 11.19, pp. 11-83 to 11-84 [stating abuse of discretion as the federal standard of review].) As for each of the subordinate determinations, it employs the test appropriate thereto. Thus, it examines for substantial evidence any finding as to “whether and how the prospective juror’s views on” the death penalty “would affect his performance as a juror.”
 
 (People
 
 v.
 
 Ashmus
 
 (1991) 54 Cal.3d 932, 962 [2 Cal.Rptr.2d 112, 820 P.2d 214].) It also examines for substantial evidence any “finding on what those views actually are.”
 
 (Ibid.)
 
 Having scrutinized the record on appeal, we find no error. The superior court’s overruling of Waidla’s challenges for cause against Prospective Jurors Gelles, Martinek, English, and Weston, and then Prospective Juror Brack was not unreasonable. Certainly, there was more than substantial evidence for any finding, whether express in fact or implied at law, that none held views on the death penalty, whatever their precise contours, that “would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ”
 
 (Wainwright v. Witt, supra,
 
 469 U.S. at p. 424 [105 S.Ct. at p. 852], quoting
 
 Adams
 
 v.
 
 Texas, supra,
 
 448 U.S. at p. 45 [100 S.Ct. at p. 2526] .)
 
 [3]
 

 3.
 
 Admission of Evidence of Waidla’s Views on Money and Work
 

 During their direct examination of Rita Hughes, Avo and Viivi Piirisild’s daughter, the People attempted to ask questions including, in the prosecutor’s words, whether Waidla had “mention[ed]” any “feelings” that
 
 *716
 
 he may have had “about his economic situation in the United States.” Through counsel, Waidla objected, evidently under California statutory law, on the grounds that the question was vague and ambiguous and that any answer would be irrelevant.
 

 Outside of the presence of the jury, the superior court requested an offer of proof from the People. The prosecutor represented that the People would elicit testimony from Rita to the effect that, in the course of a conversation that she had had with Waidla and Sakarias, Waidla made statements expressing, among other things, a desire to get money without working. Through counsel, Waidla objected to the admission of such testimony, again evidently under California statutory law, as irrelevant. The superior court overruled the objection. It determined that the testimony in question was indeed relevant. It did so because it effectively concluded that the testimony had at least some tendency in reason to prove the disputed material fact whether Waidla had a motive for the murder of Viivi and the related burglary and robbery and for the other offenses and, therefore, whether he was the perpetrator thereof. It thereupon ruled the testimony admissible.
 

 Under the People’s direct examination, now resumed before the jury, Rita testified, in pertinent part, as follows: In the course of a conversation that she had had with Waidla and Sakarias, in which Sakarias “did most of the talking” and Waidla “basically nodded or smoked a cigarette, and . . . nodded occasionally,” the two men stated that they “wanted to get rich quickly,” and discussed “living on the beach in Hawaii and traveling all around the world making money and living the high life”; but they “didn’t want to be working stiffs”; they “brought up the example of’ a man who was apparently an acquaintance who had “acquired” a “Jaguar” or “Peugeot” “at the age of 60,” and they “thought what a waste, that he is too old to appreciate such a fine car, and that it would be nice to have a fancy Cadillac or a Mercedes or whatever at an early age”; they “frowned upon” the “American work ethic,” “us[ing] the example of [a] man back east on the east coast who had two Buicks and [a] house in the suburbs and [a] country home, and . . . that was all he amounted to after 50 years of hard work, and what a waste of a life”; they “felt that they were treated better financially in Estonia,” where, Sakarias said, a person could obtain “government money because the government was so corrupt.” At one point, Rita was asked by the prosecutor to identify the speaker of certain statements to which she testified, but she failed to do so.
 

 Waidla now contends that the superior court erred under California statutory law in its ruling on the admissibility of Rita’s testimony about his desire to get money without working, on the ground that such testimony was
 
 *717
 
 inadmissible hearsay outside of any exception, including that for admissions and adoptive admissions.
 

 Hearsay is evidence of a statement made by a declarant outside of court and offered in court for its truth. (Evid. Code, § 1200, subd. (a).) As a rule, it is inadmissible.
 
 (Id.,
 
 § 1200, subd. (b).) Exceptions, however, exist. (See generally
 
 id.,
 
 § 1220 et seq.) One covers admissions, which involve a statement by a declarant introduced against the declarant himself in an action to which he is a party.
 
 (Id.,
 
 § 1220.) Another covers adoptive admissions, which involve a statement by a declarant introduced against a party who, with knowledge thereof, manifested his adoption of it or his belief in its truth.
 
 (Id.,
 
 § 1221.)
 

 Waidla has not preserved the claim for review. “It is, of course, ‘the general rule’ ”—which we find applicable here—“ ‘that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.’ ”
 
 (People
 
 v.
 
 Benson
 
 (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330], quoting
 
 People
 
 v.
 
 Rogers
 
 (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; accord, e.g.,
 
 People v. Alvarez
 
 (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Here, Waidla rests his point on an assertion of inadmissible hearsay. Below, however, he never made any objection whatsoever on that basis. Because of his omission, we are without evidence to identify precisely what parts of Rita’s testimony about his desire to get money without working might have amounted to otherwise inadmissible hearsay. Likewise, because of his omission, we are without evidence to judge confidently what parts of the testimony in question that might have amounted to otherwise inadmissible hearsay might have come within one or more exceptions, including the apparently available ones covering admissions and adoptive admissions. He alone must bear the consequences of the evidentiary void for which he alone is responsible.
 

 To the extent that Waidla has indeed preserved a claim for review—albeit not the one that he attempts to raise—he fails on the merits.
 

 Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.
 
 (People
 
 v.
 
 Alvarez, supra,
 
 14 Cal.4th at p. 201; accord,
 
 People v. Rowland
 
 (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Speaking more particularly, it examines for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in question. (E.g.,
 
 People v. Alvarez, supra,
 
 14 Cal.4th at p. 201;
 
 People
 
 v.
 
 Clair, supra,
 
 2
 
 *718
 
 Cal.4th at pp. 670-671.) That is because it so examines the underlying determination as to relevance itself. (E.g.,
 
 People v. Alvarez, supra,
 
 14 Cal.4th at p. 201;
 
 People v. Rowland, supra, 4
 
 Cal.4th at p. 264.) Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210.)
 

 Any claim by Waidla that the superior court erred under California statutory law in its ruling on the admissibility of Rita’s testimony about his desire to get money without working, on the ground that such testimony was irrelevant, would not succeed. The superior court did not err on that basis. For it did not abuse its discretion in determining that the testimony in question was indeed relevant. Plainly, it would not have been unreasonable for the superior court to have concluded, as it effectively did, that the testimony had at least some tendency in reason to prove the disputed material fact whether Waidla had a motive for the murder of Viivi and the related burglary and robbery and for the other offenses and, therefore, whether he was the perpetrator thereof.
 
 [4]
 

 Waidla complains that his counsel provided ineffective assistance under the counsel clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment, and also under the counsel clause of section 15 of article I of the California Constitution, by failing to object to the admissibility of Rita’s testimony about his desire to get money without working on grounds in addition to irrelevance, including inadmissible hearsay.
 

 To establish ineffective assistance under the Sixth Amendment’s counsel clause, Waidla must demonstrate both deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of reasonable probability of an-adverse effect on the outcome. (E.g.,
 
 Strickland v. Washington
 
 (1984) 466 U.S. 668, 687-696 [104 S.Ct. 2052, 2064-2069, 80 L.Ed.2d 674].) To establish ineffective assistance under the counsel clause of article I, section 15 of the California Constitution, he must do the same. (E.g.,
 
 People v. Ledesma
 
 (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839].)
 

 
 *719
 
 Even if Waidla can demonstrate deficient performance, a point on which we do not pass, he cannot demonstrate prejudice. It is not reasonably probable that his counsel’s failure to object on grounds including inadmissible hearsay, even if professionally unreasonable, adversely affected the outcome. That is because it is not reasonably probable that any such objection, even if sustained by the superior court in the face of the apparently available exceptions covering admissions and adoptive admissions, would have resulted in the returning of any more favorable verdict or finding by the jury. Although unflattering, the testimony in question was hardly determinative of the balance between inculpation and exculpation or aggravation and mitigation. Waidla may be right to state that the testimony presented him as “feeling entitlement to an elevated standard of living” and as “disrespecting the American work ethic itself.” But he is simply wrong to state that it was “inflammatory.”
 

 4.
 
 Admission of Evidence of Viivi Piirisild’s Fear of Waidla
 

 During their direct examination of Rita Hughes, the People asked, in the prosecutor’s words, “[Pjrior to” the date of Viivi Piirisild’s murder and the related burglary and robbery, “did you discuss with [Viivi] possibly visiting her at . . . home?” and Rita answered, “Yes. . . .1 called her early” one morning, “and I wanted to go home to her, and she said for me not to come home.” “Did you discuss why you should not go home?” “She said it would not be safe.” “And what was the reason for her not wanting you to come home?” “She was afraid of’ Waidla and Sakarias “coming by, and that I might be hurt.” “Did she tell you what the basis of her fears were, why she thought they might come by?”
 

 At this point, the superior court called the prosecutor and Waidla’s counsel to the bench. Outside of the presence of the jury, it requested an offer of proof. The prosecutor represented that Rita would testify that Viivi told her that she feared Waidla and Sakarias because “she was alone” while Avo was away on his business trip, and “believed” or “thought” that “she had seen them driving by . . . the house.” As for Rita’s testimony about Viivi’s statement declaring her fear of Waidla and Sakarias, he argued that, under California statutory law, it was admissible hearsay within the state-of-mind exception because the statement was offered to prove that, in the burglary and robbery related to her murder, she did not engage in certain conduct, that is, she did not consent to the entry in the burglary or the taking by means of force or fear in the robbery. By doing so, he effectively argued that, under California statutory law, it was relevant because it had at least some tendency in reason to prove the disputed material fact of consent for the burglary and robbery. Waidla’s counsel objected, evidently under California statutory law, on the ground that Rita’s expected testimony about
 
 *720
 
 Viivi’s statement declaring the
 
 basis
 
 of her fear would be inadmissible hearsay, adding that it would be “totally beyond” his “ability to cross-examine” Viivi on the matter. He also objected, again evidently under California statutory law, that Rita’s expected testimony about Viivi’s statement of the basis of her fear would be substantially more prejudicial than probative. He apparently extended his hearsay and undue-prejudice objections to reach Rita’s testimony about Viivi’s statement of her fear itself, suggesting that it was irrelevant because lack of consent was not a disputed material fact under the defense to be presented. The superior court overruled the hearsay and undue-prejudice objections to Rita’s testimony about Viivi’s statement of her fear, indicating its view to the effect that the statement was relevant and was not, in itself, substantially more prejudicial than probative, and “ruling” that consent was a “definite, genuine issue in the lawsuit.” But it sustained the undue-prejudice objection to Rita’s expected testimony about Viivi’s statement of the basis of her fear as “repetitive and cumulative.” In response, the prosecutor indicated that he had nothing further to ask Rita.
 

 Later, during their direct examination of Avo Piirisild, the People attempted to ask about statements that Viivi made on July 4, 1988, as Waidla and Sakarias arrived at the front door of the Piirisilds’ North Hollywood home. Waidla’s counsel interposed an objection that any answer would be inadmissible hearsay. The superior court sustained the objection.
 

 At the prosecutor’s request, the superior court called the prosecutor and Waidla’s counsel to the bench. Outside of the presence of the jury, the prosecutor volunteered an offer of proof, representing that Avo would testify to various statements by Viivi declaring her fear of Waidla and Sakarias and/or indicating such fear circumstantially, as through the tone in which they were spoken. He argued that the expected testimony would be admissible hearsay within the state-of-mind exception, apparently to the extent that it was hearsay at all, because any such statements would be offered to prove lack of consent in the burglary and robbery related to her murder. Waidla’s counsel argued to the contrary. He added that any such statements would be irrelevant because lack of consent was not a disputed material fact under the defense to be presented. The superior court asked Waidla’s counsel and the prosecutor whether Waidla and the People would each enter into a stipulation relating to lack of consent. For Waidla, his counsel answered in the affirmative. For the People, the prosecutor passed the question, expressing concern that a stipulation “may not bring the full flavor” of the evidence. The superior court stated that it had been considering whether or not to “force” the People to stipulate by “rul[ing] the evidence doesn’t come in.” It decided, instead, to hold the “issue ... in abeyance.”
 

 
 *721
 
 Under the People’s direct examination, now resumed before the jury, Avo continued to testify on other matters.
 

 Soon, the superior court called the prosecutor and Waidla’s counsel to the bench. Outside of the presence of the jury, it expressed its belief that “the issue of consent to take the property, the issue of consent to enter the home, is an issue in litigation,” and obtained the agreement of both the prosecutor and Waidla’s counsel on the point. “The issue,” it went on, “is whether or not” to “allow that in by stipulation or by evidence” in the form of Avo’s expected testimony about Viivi’s statements declaring and/or circumstantially indicating her fear of Waidla and Sakarias. Because it determined that a stipulation would not be equivalent to evidence, it choose not to “force” the People to enter into one. It expressed its belief that “it really boils down to a[n] . . . issue” whether Avo’s expected testimony about the statements in question would be substantially more prejudicial than probative, and obtained the agreement of both the prosecutor and Waidla’s counsel on this point as well. After stating that it had “weighted]” probativeness and prejudice, it determined that Avo’s expected testimony would not, in fact, be substantially more prejudicial than probative. As a result, it allowed its introduction. It informed Waidla’s counsel that, “[i]f the evidence comes in” and he “ask[ed] for a limiting instruction,” it would “gladly give . . . one.” Waidla’s counsel responded that he “would” indeed “ask,” “since” he “obviously” could not “cross-examine” Viivi herself.
 

 Under the People’s direct examination, again resumed before the jury, Avo undertook to testify. Before he did so, the superior court gave the jury a limiting instruction that the “statements of [Viivi] Piirisild that you are about to hear are not being introduced for the truth asserted. They’re not being introduced for their truth. They’re being introduced to show [her] state of mind to explain her conduct”; “[n]ot for the truth asserted whatsoever, but only to [her] state of mind . . . , to explain her conduct then and later.” In response to the superior court’s query whether the admonition was “agreeable,” Waidla’s counsel stated, “Yes.” Avo proceeded to testify to statements by Viivi, in some of which she arguably declared her fear of Waidla and Sakarias, and in others of which she unarguably indicated such fear circumstantially.
 

 Later still, at the prosecutor’s request, the superior court called the prosecutor and Waidla’s counsel to the bench. Outside of the presence of the jury, the prosecutor volunteered an offer of proof prior to the direct examination of George Charon, the Federal Bureau of Investigation Special Agent with whom Viivi was acquainted. He represented that, in pertinent part, Charon would testify to various statements by Viivi, a few days after July 4,
 
 *722
 
 1988, in some of which she declared her fear of Waidla and Sakarias, and in others of which she indicated such fear circumstantially. He argued that Charon’s expected testimony would be relevant and not substantially more prejudicial than probative. He also argued that it would be admissible hearsay within the state-of-mind exception, apparently to the extent that it was hearsay at all, because any such statements would be offered to prove lack of consent in the burglary and robbery related to her murder. Waidla’s counsel effectively made irrelevance, undue prejudice, and hearsay objections to Charon’s expected testimony. As for the undue prejudice objection, he argued that “there is no way” that he could “cross-examine” Viivi herself. The superior court overruled the objections to Charon’s expected testimony. Against the undue-prejudice objection, it determined that the testimony would not be substantially more prejudicial than probative, stating that it had “weigh[edj” probativeness and prejudice. As a result, it allowed the introduction of Charon’s expected testimony. It offered to give a limiting instruction for purposes of hearsay, and Waidla’s counsel accepted.
 

 Under the People’s direct examination, Special Agent Charon commenced his testimony. In its course, the superior court gave the jury a limiting instruction that the “statements of [Viivi] Piirisild are not being introduced for the truth asserted. They’re only being introduced to show her state of mind to explain subsequent conduct. They’re not being introduced for the truth asserted.” In response to the superior court’s query whether the admonition was “sufficient,” Waidla’s counsel stated, “Yes.” Charon proceeded to testify to statements by Viivi, in some of which she declared her fear of Waidla and Sakarias, and in others of which she indicated such fear circumstantially.
 

 Subsequently, in its charge to the jury, the superior court instructed: “Certain evidence was admitted for a limited purpose. [¶] At the time this evidence was admitted you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] Do not consider such evidence for any purpose except the limited purpose for which it was admitted.”
 

 Waidla now contends, in effect, that the superior court erred under California statutory law in its rulings on the admissibility of the testimony of Rita, Avo, and Special Agent Charon about statements by Viivi declaring and/or circumstantially indicating her fear of him and Sakarias, on the ground that the underlying statements were irrelevant.
 

 At the outset, we believe that Waidla has preserved the claim for review. He adequately satisfied the specific-and-timely-objection rule.
 

 
 *723
 
 On the merits, however, we conclude that the claim fails.
 

 As stated, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including, as noted, one that turns on the relevance of the evidence in question.
 

 We find not unreasonable the superior court’s determinations of the relevance of the testimony in question by Rita, Avo, and Special Agent Charon, some express, others implied. Viivi’s underlying statements declaring and/or circumstantially indicating her fear of Waidla and Sakarias had at least some tendency in reason to prove the fact of lack of consent in the burglary and robbery related to her murder. Lack of consent was material to burglary because it was material to the element of entry (see, e.g., 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Property, § 662, p. 743), and was also material to robbery because it was material to the element of taking by means of force or fear (see, e.g.,
 
 id.,
 
 § 648(b), p. 729). Lack of consent was also disputed with regard thereto. As a fact going to an element of burglary and an element of robbery, it was put into dispute by Waidla’s plea of not guilty, and remained in dispute until it was resolved
 
 (People
 
 v.
 
 Rowland, supra, 4
 
 Cal.4th at p. 260), as it was only by the jury’s adverse verdicts. That Waidla, by presenting the defense that he did, chose not to dispute it
 
 actually
 
 is without effect. As a fact going to an element of burglary and an element of robbery, it had to be proved by the People, and proved beyond a reasonable doubt. (See Pen. Code, § 1096.) That it might have been proved other than by the statements in question
 
 [5]
 
 is also without effect. A fact’s relevance does not depend on the means of its proof.
 

 Waidla also contends that the superior court erred under California statutory law in its rulings on the admissibility of the testimony of Rita, Avo, and Special Agent Charon about statements by Viivi declaring and/or circumstantially indicating her fear of him and Sakarias, on the ground that the underlying statements were substantially more prejudicial than probative.
 

 We again believe that Waidla has preserved the claim for review. He satisfied the specific-and-timely-objection rule not only adequately, but fully.
 

 
 *724
 
 But again we conclude that the claim fails.
 

 As stated, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question (e.g.,
 
 People
 
 v.
 
 Alvarez, supra,
 
 14 Cal.4th at pp. 214-215;
 
 People v. Rowland, supra, 4
 
 Cal.4th at p. 264). Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable “risk to the fairness of the proceedings or the reliability of the outcome”
 
 (People v. Alvarez, supra,
 
 14 Cal.4th at p. 204, fn. 14).
 

 We find not unreasonable the superior court’s determinations that the testimony in question by Rita, Avo, and Special Agent Charon was not substantially more prejudicial than probative. Viivi’s underlying statements declaring and/or circumstantially indicating her fear of Waidla and Sakarias, as explained, were relevant, having at least some tendency in reason to prove the fact of lack of consent in the burglary and robbery related to her murder. The superior court discerned no intolerable risk to the proceedings’ fairness or the outcome’s reliability. We cannot say that it exceeded the limits of reason in this regard. We are surely unable to agree with Waidla that the statements in question were inflammatory. We are even less able to agree that they were not worthy of belief. Waidla himself does not seem seriously to doubt that Viivi was actually afraid.
 
 [6]
 

 Waidla contends, in addition, that the superior court erred under California statutory law in its rulings on the admissibility of the testimony of Rita, Avo, and Special Agent Charon about statements by Viivi declaring and/or circumstantially indicating her fear of him and Sakarias, on the ground that the underlying statements constituted inadmissible hearsay outside of any exception, including that for state of mind.
 

 Here too, we believe that Waidla has preserved the claim for review. He satisfied the specific-and-timely-objection rule not only adequately, but fully.
 

 
 *725
 
 But here, too, we conclude that the claim fails.
 

 As stated, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question (e.g.,
 
 People v. Alvarez, supra,
 
 14 Cal.4th at p. 203;
 
 People
 
 v.
 
 Rowland, supra, 4
 
 Cal.4th at p. 264).
 

 We find not unreasonable the superior court’s determinations that the testimony in question by Rita, Avo, and Special Agent Charon was admissible hearsay within the state-of-mind exception. This exception embraces evidence of a statement of a declarant’s state of mind offered to prove the declarant’s conduct, unless such statement was made under circumstances indicating its lack of trustworthiness. (Evid. Code, § 1250, subd. (a)(2).) Viivi’s underlying statements declaring her fear of Waidla and Sakarias were within this exception. They were offered to prove lack of consent on her part in the burglary and robbery related to her murder. Furthermore, they were apparently not untrustworthy. Waidla asserts that other statements by Viivi were unreliable. Even if true, her statements declaring her fear were not. As noted, Waidla himself does not seem seriously to doubt that she was actually afraid. In addition, statements by Viivi indicating her fear of Waidla and Sakarias circumstantially were not even hearsay at all, because they were not offered for their truth.
 

 Notwithstanding his counsel’s contemporaneous acceptance, Waidla complains of the limiting instructions that the superior court gave the jury as to the testimony in question by Avo and Special Agent Charon. Contrary to his implication, there is no basis to judge them ineffectual. The presumption is that limiting instructions are followed by the jury. (See, e.g.,
 
 People
 
 v.
 
 Anderson
 
 (1987) 43 Cal.3d 1104, 1120 [240 Cal.Rptr. 585, 742 P.2d 1306].) That presumption is not rebutted here. Had Waidla believed then, as he apparently believes now, that the limiting instructions should have expressly admonished the jury against using Viivi’s statements declaring and/or circumstantially indicating her fear of him and Sakarias in order to infer that they had planned, and then executed, the events resulting in her murder and the related burglary and robbery, he should have requested the superior court to make a modification. He did not. In addition, had he believed then, as he apparently believes now, that the prosecutor himself so used the statements in question in the course of his summation,
 
 [7]
 
 he should have asked the superior court to make an assignment of misconduct and to give an admonishment. Again, he did not.
 

 
 *726
 
 In our view, it is the People who might have raised a complaint against the limiting instructions with more justification. Viivi’s statements declaring her fear of Waidla and Sakarias were offered for their truth—that is to say, to prove fear in order to prove lack of consent. Properly so, because they were within the state-of-mind exception. The limiting instructions may have been
 
 too
 
 limiting, by unduly restricting their use by the jury. Any error in this respect, however, could have prejudiced only the People.
 
 [8]
 

 5.
 
 Denial of Motion to Suppress Confession Under Miranda
 

 Not long after the superior court called the cause to trial, Waidla made a motion to suppress certain statements that he made to the police, including his confession, on the ground that the police obtained the statements in violation of
 
 Miranda v. Arizona
 
 (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (hereafter sometimes Miranda) and its progeny, including
 
 Edwards v. Arizona
 
 (1981) 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (hereafter sometimes
 
 Edwards)
 
 and
 
 Arizona
 
 v.
 
 Roberson
 
 (1988) 486 U.S. 675 [108 S.Ct. 2093, 100 L.Ed.2d 704] (hereafter sometimes
 
 Roberson),
 
 and thereby rendered them inadmissible.
 

 In
 
 Miranda,
 
 the court laid down a rule of a “prophylactic” nature
 
 (Michigan v. Tucker
 
 (1974) 417 U.S. 433, 446 [94 S.Ct. 2357, 2365, 41
 
 *727
 
 L.Ed.2d 182]) in order to protect the privilege against self-incrimination of the Fifth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment: “[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant [by law enforcement officers] unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.”
 
 (Miranda v. Arizona, supra,
 
 384 U.S. at p. 444 [86 S.Ct. at p. 1612].)
 

 In
 
 Edwards,
 
 the court laid down another rule of a “prophylactic” nature
 
 (Oregon
 
 v.
 
 Bradshaw
 
 (1983) 462 U.S. 1039, 1044 [103 S.Ct. 2830, 2834, 77 L.Ed.2d 405] (plur. opn. of Rehnquist, J.); accord, e.g.,
 
 Davis v. United States
 
 (1994) 512 U.S. 452, 458 [114 S.Ct. 2350, 2354, 129 L.Ed.2d 362]), which it reaffirmed in
 
 Roberson,
 
 in order to protect the prophylactic rule of
 
 Miranda
 
 itself by preventing the “badgering” of a defendant by law enforcement officers in an effort to get him to waive his rights thereunder
 
 (Michigan
 
 v.
 
 Harvey
 
 (1990) 494 U.S. 344, 350 [110 S.Ct. 1176, 1180, 108 L.Ed.2d 293]; accord, e.g.,
 
 Davis v. United States, supra,
 
 512 U.S. at p. 458 [114 S.Ct. at pp. 2354-2355]): “[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him”
 
 (Edwards
 
 v.
 
 Arizona, supra,
 
 451 U.S. at pp. 484-485 [101 S.Ct. at pp. 484-485];
 
 Arizona v. Roberson, supra,
 
 486 U.S. at p. 677 [108 S.Ct. at p. 2096]), and indeed until counsel is actually present
 
 (Minnick v. Mississippi
 
 (1990) 498 U.S. 146, 153 [111 S.Ct. 486, 491, 112 L.Ed.2d 489]), “unless the accused himself initiates further communication, exchanges, or conversations with the police”
 
 (Edwards v. Arizona, supra,
 
 451 U.S. at p. 485 [101 S.Ct. at p. 485]; accord, e.g.,
 
 Minnick v. Mississippi, supra,
 
 498 U.S. at p. 150 [111 S.Ct. at p. 489];
 
 Arizona v. Roberson, supra,
 
 486 U.S. at p. 677 [108 S.Ct. at p. 2096]). “An accused ‘initiates’ ” further communication, exchanges, or conversations of the requisite nature “when he speaks words or engages in conduct that can be ‘fairly said to represent a desire’ on his part ‘to open up a more generalized discussion relating directly or indirectly to the investigation.’ ”
 
 (People
 
 v.
 
 Mickey, supra,
 
 54 Cal.3d at p. 648, quoting
 
 Oregon
 
 v.
 
 Bradshaw, supra,
 
 462 U.S. at p. 1045 [103 S.Ct. at p. 2835] (plur. opn. of Rehnquist, J.); accord,
 
 Oregon v. Bradshaw, supra,
 
 462 U.S. at p. 1045 (plur. opn. of Rehnquist, J.);
 
 id.
 
 at p. 1055 [103 S.Ct. at p. 2840] (dis. opn. of Marshall, J.).) “In the event he does in fact ‘initiate’ ” such further
 
 *728
 
 communication, exchanges, or conversations, “the police may commence interrogation if he validly waives his [Miranda] rights.”
 
 (People v. Mickey, supra,
 
 54 Cal.3d at p. 649; accord,
 
 Edwards
 
 v.
 
 Arizona, supra,
 
 451 U.S. at p. 486, fn. 9 [101 S.Ct. at p. 1085];
 
 Oregon v. Bradshaw, supra,
 
 462 U.S. at p. 1046 [103 S.Ct. at p. 2835] (plur. opn. of Rehnquist, J.).)
 

 Waidla’s motion was based on, among other things, an assertion that “[t]he People have not indicated through any information provided during discovery that counsel was made available to” him, or that he “initiated the conversation with” the police, and he “does not believe the People will contend at this time that either was the case.”
 

 The superior court conducted an evidentiary hearing on Waidla’s motion, outside of the presence of the jury, in the midst of the People’s presentation of their case at trial.
 

 Robert Tripi was called to the witness stand by the People. In pertinent part, he testified to this effect: On August 28, 1988, he was employed as a border patrol agent by the United States Immigration and Naturalization Service in charge of the Jackman Main Border Patrol Station near the United States-Canada border at Rouse’s Point in New York; early that day, near the border, he detained Waidla on suspicion of illegal entry into the country, having received a tip from the Quebec Provincial Police; he did so with awareness that Waidla was being sought under an arrest warrant issued in this cause; he gave him an advisement of his
 
 Miranda
 
 rights; Waidla refused to make a waiver, responding instead that “he did not want to make a statement,” “he wanted an attorney,” and “he wanted a cigarette”; he was not provided with counsel; Tripi asked him no further questions of substance; some time later, he transported him to a correctional facility in the area of St. Albans in Vermont.
 

 Victor Pietrantoni was also called by the People. In pertinent part, he testified to this effect: On August 29, 1988, he and his partner, David Crews, were employed as detectives by the Los Angeles Police Department; that day, he and Crews arrived at the Rouse’s Point station; his primary and immediate purpose was to interrogate Waidla; his secondary and more remote purpose was to take him back to California following an extradition hearing; apparently at Pietrantoni’s request, Waidla had been brought back to the station, and was being kept in a holding cell in one of its rooms; he had not been provided with counsel; Pietrantoni was in the room with the holding cell; Crews was not, but was apparently elsewhere in the station, possibly going through property seized from Waidla on his detention; a border patrol agent conducted Waidla out of the holding cell; immediately,
 
 *729
 
 Waidla addressed Pietrantoni, asking, “You’re the detective from Los Angeles?”; Pietrantoni believed that Waidla may have seen him and Crews in New York City about two weeks earlier as they entered the Estonian House, which was evidently a cultural center, in an attempt to track him down; Pietrantoni “told [Waidla] what [his] name was” and “where [he] was from”; as he was “in the process of telling” Waidla that he and Crews “had come from California,” Waidla “interrupted” him and said, “What can I do for you,” or “What do you want from me?”; Pietrantoni “asked [Waidla] not to speak,” and said that he “would get a room where [they] could sit down and [he] would explain [his] reason for being there”; he did so, in part, because he “didn’t want [Waidla] to get into a discussion at that time prior to . . . having advised him of his rights”; finding a room, Pietrantoni and Waidla each took a seat across a desk from one another; Pietrantoni “began to once again explain that [he] was there from California to investigate the murder of Viivi Piirisild,” and he “may have told him [Crews’s] name again, that [they] were police detectives from Los Angeles”; Waidla volunteered that “he knew Viivi very well and that he had lived with the Piirisilds and that. . . Avo was his best friend”; Pietrantoni “once again cautioned him not to say anything,” and he “asked him to please just listen to what [he] had to say”; he told him the purposes for which he had come; he “advised him shortly thereafter that he was a suspect in the case”; Waidla again interrupted, asking, “What can I do to help you[?],” or “What can I do for you[?],” “something along those lines”; Pietrantoni “once again told him,” “Just listen to what I have to say . . .”; Pietrantoni advised him of his
 
 Miranda
 
 rights and Waidla waived such rights; at the beginning of the ensuing uncounseled interrogation by Pietrantoni, who was apparently joined by Crews, Waidla denied any participation in Viivi’s murder and the related burglary and robbery, asserting as an alibi that he had left the Los Angeles area three days earlier to hitchhike to New York alone without Sakarias; later, withdrawing the alibi, he admitted participation, albeit minimal, in the form of helping Sakarias move Viivi’s body after Sakarias had killed her by himself; the next day, August 30, 1988, now at the Clinton County Jail in New York, Pietrantoni again advised Waidla of his
 
 Miranda
 
 rights and Waidla again waived such rights; in the course of the ensuing uncounseled interrogation by Pietrantoni, who was joined by Crews, Waidla made his confession.
 

 During his testimony, Detective Pietrantoni denied that he had been informed that Waidla had been advised of his
 
 Miranda
 
 rights by Agent Tripi, had refused to waive such rights, and had instead asserted his right to silence and his right to an attorney. In addition, he admitted that he did not possess evidence recording or memorializing his dealings with Waidla when first they met at the Rouse’s Point station. Later, Waidla’s counsel made plain
 
 *730
 
 that he had been surprised by Pietrantoni’s testimony about these dealings. Later still, the prosecutor represented that he had learned of the substance of the testimony only shortly before it was given.
 

 Taking the stand in his own behalf, Waidla, among other things, denied that he had said anything at all to Detective Pietrantoni when first they met at the Rouse’s Point station.
 
 [9]
 

 Following the evidentiary hearing, the superior court denied Waidla’s motion. Among its determinations, it expressly found that Waidla “himself initiated the conversation with” Detective Pietrantoni, “and that as such, there is an exception to the
 
 Edwards/Roberson
 
 rule because of the fact that the defendant himself initiated the conversation.” It impliedly concluded that Pietrantoni adequately advised Waidla of his
 
 Miranda
 
 rights on each of the two occasions in question, and that Waidla effectively waived such rights each time.
 

 An appellate court applies the independent or de novo standard of review, which by its nature is nondeferential, to a trial court’s granting or denial of a motion to suppress a statement under
 
 Miranda
 
 insofar as the trial court’s underlying decision entails a measurement of the facts against the law. (See, e.g.,
 
 People v. Bradford
 
 (1997) 14 Cal.4th 1005, 1033 [60 Cal.Rptr.2d 225, 929 P.2d 544];
 
 People v. Crittenden
 
 (1994) 9 Cal.4th 83, 128 [36 Cal.Rptr.2d 474, 885 P.2d 887].) As for each of the subordinate determinations, it employs the test appropriate thereto. That is to say, it examines independently the resolution of a pure question of law; it scrutinizes for substantial evidence the resolution of a pure question of fact; it examines independently the resolution of a mixed question of law and fact that is predominantly legal; and it scrutinizes for substantial evidence the resolution of a mixed question of law and fact that is predominantly factual. (See generally
 
 People v. Louis
 
 (1986) 42 Cal.3d 969, 985-987 [232 Cal.Rptr. 110, 728 P.2d 180].)
 

 After independent review, we believe that the superior court did not err in denying Waidla’s motion.
 

 The point that is dispositive to the superior court’s ruling—on which Waidla focuses his attack—involves the express finding quoted above,
 
 *731
 
 which may be rephrased in words quoted from
 
 Edwards
 
 and subsequent decisions, as follows: Waidla “initiate[d] further communication, exchanges, or conversations” of the requisite nature with Detective Pietrantoni
 
 (Edwards
 
 v.
 
 Arizona, supra,
 
 451 U.S. at p. 485 [101 S.Ct. at p. 1885]) “when he [spoke] words [and] engage[d] in conduct that [could] be ‘fairly said to represent a desire’ on his part ‘to open up a more generalized discussion relating directly or indirectly to the investigation.’ ”
 
 (People
 
 v.
 
 Mickey, supra,
 
 54 Cal.3d at p. 648, quoting
 
 Oregon v. Bradshaw, supra,
 
 462 U.S. at p. 1045 [103 S.Ct. at p. 2835] (plur. opn. of Rehnquist, J.).)
 

 The finding of “initiation” in and of itself is “reviewed for substantial evidence” as the resolution of a “mixed question” of law and fact that is “predominantly factual.”
 
 (People v. Mickey, supra,
 
 54 Cal.3d at p. 649.) The finding of any underlying historical fact is itself reviewed for substantial evidence as the resolution of a pure question of fact. (See generally
 
 People
 
 v.
 
 Louis, supra,
 
 42 Cal.3d at p. 985.)
 

 There is substantial evidence for the finding of “initiation” in and of itself. Specifically, there is substantial evidence that Waidla’s spontaneous asking of questions to Detective Pietrantoni to the effect, “What can I do for you[?],” “What do you want from me?,” and “What can I do to help you[?],” “can be ‘fairly said to represent a desire’ on his part ‘to open up a more generalized discussion relating directly or indirectly to the investigation.’ ”
 
 (People
 
 v.
 
 Mickey, supra,
 
 54 Cal.3d at p. 648, quoting
 
 Oregon v. Bradshaw, supra,
 
 462 U.S. at p. 1045 [103 S.Ct. at p. 2835] (plur. opn. of Rehnquist, J.).) Judged, as they must be, under an objective standard (see
 
 Oregon
 
 v.
 
 Bradshaw, supra,
 
 462 U.S. at pp. 1045-1046 [103 S.Ct. at p. 2835] (plur. opn. of Rehnquist, J.);
 
 People v. Mickey, supra,
 
 54 Cal.3d at p. 648), Waidla’s words and conduct can fairly be said to represent such a desire with respect to Pietrantoni’s investigation into Viivi’s murder and the related burglary and robbery and the other offenses. In fact, their only apparent referent is that investigation, and nothing else.
 
 [10]
 
 That they might perhaps be construed otherwise if construed subjectively—for example, as merely a manifestation of politeness—is of no consequence.
 

 There is also substantial evidence for the finding of the facts underlying “initiation.” Specifically, there is substantial evidence that Waidla did indeed spontaneously ask Detective Pietrantoni questions to the effect indicated above. Such evidence consists of the not-implausible testimony of Pietrantoni himself. This is not to deny that a basis exists to doubt Pietrantoni’s
 
 *732
 
 testimony, as recently fabricated to defeat Waidla’s motion. But a basis also exists, one that is at least as firm, to doubt Waidla’s testimony to the contrary, as perjuriously given to cause his motion to succeed. The ultimate question goes to credibility. The superior court expressly recognized as much. Its resolution of this question, which is itself reviewed for substantial evidence (see, e.g.,
 
 People
 
 v.
 
 Bradford, supra,
 
 14 Cal.4th at p. 1033;
 
 People v. Crittenden, supra,
 
 9 Cal.4th at p. 128), was in favor of Pietrantoni and against Waidla. It passes scrutiny because Pietrantoni’s testimony, as stated, is not implausible.
 

 We do not ignore the fact that, in making his attack on the express finding going to “initiation,” Waidla asserts that the exception to the
 
 Edwards
 
 rule requires that “the accused himself’ must “initiate[]” not only “further communication, exchanges, or conversations with the police”
 
 (Edwards v. Arizona, supra,
 
 451 U.S. at p. 485 [101 S.Ct. at p. 1885]), but also the encounter at which he does so. We have previously rejected this very assertion.
 
 (People
 
 v.
 
 Mickey, supra,
 
 54 Cal.3d at p. 652.) We reject it again. Waidla quotes language that, in isolation, seems to support his position. (See, e.g.,
 
 Minnick v. Mississippi, supra,
 
 498 U.S. at p. 156 [111 S.Ct. at p. 492] (dis. opn. of Scalia, J.);
 
 Edwards v. Arizona, supra,
 
 451 U.S. at pp. 485 & 486, fn. 9 [101 S.Ct. at pp. 1885-1886].) But he fails to cite any holding that, in context, actually does so.
 

 Neither do we ignore the fact that Detective Pietrantoni himself would evidently have “initiate[d] further communication, exchanges, or conversations” with Waidla
 
 (Edwards v. Arizona, supra,
 
 451 U.S. at p. 485 [101 S.Ct. at p. 1885]) outside of the exception to the
 
 Edwards
 
 rule, had not Waidla initiated them with him instead. It is nevertheless true that there is substantial evidence that it was Waidla who initiated and not Pietrantoni. Waidla may have saved Pietrantoni from himself. But save him he did.
 
 [11]
 

 6.
 
 Failure to Instruct Sua Sponte on Trespass and Assault as Lesser Included Offenses of Burglary and Robbery
 

 The superior court instructed the jury on burglary and robbery as charged against Waidla, specifically, the burglary of the Piirisilds’ North Hollywood home based on larceny and the robbery of Viivi Piirisild therein, as independent felonies, as bases for first degree murder on theories of felony-murder burglary and felony-murder robbery, and as components of
 
 *733
 
 the felony-murder-burglary and felony-murder-robbery special circumstances. It did not instruct on trespass or assault, which were not charged. Waidla’s counsel did not request any such instructions.
 

 Waidla contends that the superior court erred under California decisional law by failing to instruct the jury sua sponte on trespass and assault as offenses that were lesser than, and included in, the charged burglary and robbery, respectively.
 

 An appellate court applies the independent or de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense. Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that, we believe, is however predominantly legal. As such, it should be examined without deference.
 

 A trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which the defendant is charged “only if [citation] ‘there is evidence’ ”
 
 (People v. Memro
 
 (1995) 11 Cal.4th 786, 871 [47 Cal.Rptr.2d 219, 905 P.2d 1305]), specifically,
 
 “substantial
 
 evidence”
 
 (People
 
 v.
 
 Berryman
 
 (1993) 6 Cal.4th 1048, 1081 [25 Cal.Rptr.2d 867, 864 P.2d 40], italics added, overruled on a point not pertinent to this cause in
 
 People
 
 v.
 
 Hill
 
 (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]), “ ‘which, if accepted . . . , would absolve [the] defendant from guilt of the greater offense’ [citation]
 
 but not the
 
 lesser”
 
 (People
 
 v.
 
 Memro, supra,
 
 11 Cal.4th at p. 871, italics in original). (Accord,
 
 People
 
 v.
 
 Lopez
 
 (1998) 19 Cal.4th 282, 287-288 [79 Cal.Rptr.2d 195, 965 P.2d 713]; see, e.g.,
 
 People
 
 v.
 
 Breverman
 
 (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)
 

 For purposes of discussion only, we will accept this assertion made by Waidla: Under the “ ‘accusatory pleading’ test”
 
 (People v. Breverman, supra,
 
 19 Cal.4th at p. 182 (dis. opn. of Mosk, J.)) if not the “ ‘legal elements’ test” (ibid.)—according to Waidla—trespass should here be deemed a lesser included offense of the charged burglary, on the ground that the burglary here, which is based on larceny, comprises elements embracing intent to steal (e.g.,
 
 People
 
 v.
 
 Thompson
 
 (1980) 27 Cal.3d 303, 313 & fn. 5 [165 Cal.Rptr. 289, 611 P.2d 883]), whereas trespass comprises supposedly the same elements with the pertinent exception of such intent (see, e.g., Pen. Code, §§ 602, subd. (l), 602.5). Similarly, under the “accusatory pleading” test if not the “legal elements” test—again according to Waidla—assault should here be deemed a lesser included offense of the charged robbery, on the ground that robbery comprises elements embracing intent to steal (e.g.,
 
 *734
 

 People
 
 v.
 
 Thompson, supra,
 
 27 Cal.3d at p. 313), whereas assault comprises supposedly the same elements with the pertinent exception of such intent (see Pen. Code, § 240 et seq.).
 

 For no purpose, however, will we accept this further assertion made by Waidla—which, we observe, did
 
 not
 
 figure in the defense that he presented at trial: There was supposedly substantial evidence that, when he committed the charged burglary and robbery, he did not intend to steal any item of the Piirisilds’ personal property because—as he claims—he intended
 
 only
 
 to take items as to which, to quote
 
 People
 
 v.
 
 Butler
 
 (1967) 65 Cal.2d 569, 573 [55 Cal.Rptr. 511, 421 P.2d 703], he had a “right or claim” under a “bona fide belief,” namely, Avo’s Triumph or its worth in cash, a state of mind that would have “negate[d]” any intent to steal.
 
 [12]
 

 What is crucial was the mental state with which Waidla committed the charged burglary and robbery. (See
 
 People v. Barnett
 
 (1998) 17 Cal.4th 1044, 1145 [74 Cal.Rptr.2d 121, 954 P.2d 384];
 
 People v. Romo
 
 (1990) 220 Cal.App.3d 514, 519 [269 Cal.Rptr. 440].) More precisely, what mattered for the burglary was his state of mind when he entered the Piirisilds’ home, because burglary based on larceny requires intent to steal on entry (see, e.g.,
 
 People v. Holt
 
 (1997) 15 Cal.4th 619, 669 [63 Cal.Rptr.2d 782, 937 P.2d 213];
 
 People v. Collins
 
 (1878) 53 Cal. 185, 186-187
 
 (per curiam)).
 
 And what mattered for the robbery was his state of mind when he effected a taking from Viivi by means of force or fear, because robbery requires an intent to steal accompanying the use of such means (e.g.,
 
 People v. Green
 
 (1980) 27 Cal.3d 1, 52-54 [164 Cal.Rptr. 1, 609 P.2d 468]).
 

 On our independent review, there was substantial evidence that, when he committed the charged burglary and robbery, which were close to contemporaneous, Waidla was angry with Avo and especially Viivi, was desperate for money, and was scheming to resolve matters in his favor, and had been for some appreciable period of time. Prior to the commission of the burglary and robbery, he may have had a “bona fide belief’ that he had a “right or claim”
 
 (People v. Butler, supra,
 
 65 Cal.2d at p. 573) to Avo’s Triumph or its worth in cash, based on the construction and related work that he completed on their behalf. But, prior thereto, he had failed in all his efforts to obtain either the vehicle or its value.
 

 There was also substantial evidence that, because of his anger, desperation, and scheming, Waidla, in committing the charged burglary and robbery, intended to take whatever items of the Piirisilds’ personal property he
 
 *735
 
 could get his hands on, without discriminating, carefully or at all, between items concerning which he had a “bona fide belief’ of a “right or claim”
 
 (People
 
 v.
 
 Butler, supra,
 
 65 Cal.2d at p. 573), such as perhaps Avo’s Triumph or its worth in cash, and items concerning which he had no such belief. In confirmation, there was substantial evidence that he actually took whatever items of the Piirisilds’ personal property he happened to get his hands on, and did so indiscriminately, without relation to the vehicle or its value
 
 [13]
 
 —including Viivi’s purse, wallet, green jade earrings, black star sapphire pendant, and credit and telephone charge cards.
 
 [14]
 

 But there was simply no evidence, substantial or otherwise, that Waidla intended to take
 
 only
 
 items of the Piirisilds’ personal property concerning which he had a “bona fide belief’ of a “right or claim”
 
 (People v. Butler, supra,
 
 65 Cal.2d at p. 573). One might, of course, speculate that he harbored such a particularized intent. “But speculation is not evidence, less still substantial evidence.”
 
 (People v. Berryman, supra, 6
 
 Cal.4th at p. 1081; see
 
 People
 
 v.
 
 Wilson
 
 (1992) 3 Cal.4th 926, 942 [13 Cal.Rptr.2d 259, 838 P.2d 1212].)
 

 Waidla complains that his counsel provided ineffective assistance under the Sixth Amendment’s counsel clause by failing to request instructions on trespass and assault as assertedly lesser included offenses of the charged burglary and robbery, respectively. Even if he can demonstrate deficient performance, a point on which we do not pass, he cannot demonstrate prejudice. As explained, there was not substantial evidence that would absolve him of burglary and robbery but not trespass and assault. Indeed, the People’s evidence was in sum that he was guilty as charged, whereas his evidence was in sum that he was not guilty at all. It is not reasonably probable that his counsel’s failure to request instructions on trespass and assault, even if professionally unreasonable, adversely affected the outcome.
 
 *736
 
 That is because it is not reasonably probable that any such request would have resulted in the giving of such instructions by the superior court and in the returning of verdicts in accordance therewith by the jury.
 
 [15]
 

 
 *737
 
 7.
 
 Failure to Instruct Sua Sponte on Theft as a Lesser Included Offense of Robbery
 

 As stated, the superior court instructed the jury on the robbery of Viivi Piirisild as charged against Waidla as an independent felony, as a basis for first degree murder on a theory of felony-murder robbery, and as a component of the felony-murder-robbery special circumstance. It did not instruct on theft, which was not charged. Waidla’s counsel did not request any such instructions.
 

 Waidla contends that the superior court erred under California decisional law by failing to instruct the jury sua sponte on theft as an offense that was lesser than, and included in, the charged robbery.
 

 Again, a trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which the defendant is charged only if there is substantial evidence that, if accepted, would absolve the defendant from guilt of the greater offense but not the lesser.
 

 On independent review, we agree with Waidla that theft is indeed a lesser included offense of the charged robbery. That is true, specifically in this cause, under the “accusatory pleading” test. It is also true, here and elsewhere, under the “legal elements” test. “Theft,” as we have often held, “is a lesser included offense of robbery . . . .”
 
 (People v. Melton
 
 (1988) 44 Cal.3d 713, 746 [244 Cal.Rptr. 867, 750 P.2d 741]; accord, e.g.,
 
 People
 
 v.
 
 Bradford, supra,
 
 14 Cal.4th at p. 1055.) Robbery comprises elements embracing the use of force or fear to effect a taking from the victim (see, e.g.,
 
 People v. Bradford, supra,
 
 14 Cal.4th at pp. 1055-1056) and also an intent to steal (e.g.,
 
 People
 
 v.
 
 Thompson, supra,
 
 27 Cal.3d at p. 313) accompanying the use of such means (e.g.,
 
 People
 
 v.
 
 Green, supra,
 
 27 Cal.3d at pp. 52-54). Theft comprises the same elements, including intent to steal, with the pertinent exception of the use of force or fear. (See, e.g.,
 
 People v. Bradford, supra,
 
 14 Cal.4th at pp. 1055-1056.)
 

 We do not agree with Waidla, however, that there was substantial evidence that he did not intend to steal any item of the Piirisilds’ personal property when he used force or fear to effect the taking from Viivi in the charged robbery, but came to do so only afterward, with the result that the existence of such an intent accompanying the use of such means, which is necessary for robbery, would be absent
 
 (People
 
 v.
 
 Green, supra,
 
 27 Cal.3d at
 
 *738
 
 p. 54). Rather, as stated, there was substantial evidence that, for some appreciable period of time prior to the robbery, Waidla had been angry with Avo and especially Viivi, had been desperate for money, and had been scheming to resolve matters in his favor. But there was no evidence, substantial or otherwise, that he did
 
 not
 
 form
 
 any
 
 intent to steal
 
 any
 
 item until
 
 after
 
 he used force or fear to effect the taking. Ignoring the substantial evidence of his anger and especially his desperation and scheming, one might perhaps speculate that he formed the intent to steal entirely as an afterthought without any connection whatsoever to his use of force or fear to effect the taking. Speculation, however, is not enough. (See
 
 People v. Berryman, supra,
 
 6 Cal.4th at p. 1081;
 
 People v. Wilson, supra,
 
 3 Cal.4th at p. 942.)
 

 Waidla complains that his counsel provided ineffective assistance under the Sixth Amendment’s counsel clause by failing to request instructions on theft as a lesser included offense of the charged robbery. Even if he can demonstrate deficient performance, a point on which we do not pass, he cannot demonstrate prejudice. As explained, there was not substantial evidence that would absolve him of robbery but not theft. Again, the People’s evidence was in sum that he was guilty as charged, whereas his evidence was in sum that he was not guilty at all. It is not reasonably probable that his counsel’s failure to request instructions on theft, even if professionally unreasonable, adversely affected the outcome. That is because it is not reasonably probable that any such request would have resulted in the giving of such instructions by the superior court and in the returning of a verdict in accordance therewith by the jury.
 
 [16]
 

 8.
 
 Failure to Instruct Sua Sponte on Second Degree Murder, Voluntary Manslaughter, Involuntary Manslaughter, Assault, and Battery as Lesser Included Offenses of First Degree Murder
 

 As stated, the superior court instructed the jury on the murder of Viivi Piirisild as charged against Waidla, including first degree murder both on a theory of willful, premeditated, and deliberate murder and also on theories of felony-murder burglary and felony-murder robbery. It did not instruct on second degree murder, voluntary manslaughter, involuntary manslaughter, assault, or battery, which were not charged. Waidla’s counsel expressly declined to request instructions on second degree murder, and
 
 *739
 
 impliedly declined to request instructions on voluntary manslaughter, involuntary manslaughter, assault, or battery.
 

 Waidla contends that the superior court erred under California decisional law by failing to instruct the jury sua sponte on second degree murder, voluntary manslaughter, involuntary manslaughter, assault, and battery as offenses that were lesser than, and included in, the charged murder insofar as it was of the first degree.
 

 Yet again, a trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which the defendant is charged only if there is substantial evidence that, if accepted, would absolve the defendant from guilt of the greater offense but not the lesser.
 

 On independent review, we shall assume for present purposes that, under the “accusatory pleading” test if not the “legal elements” test, second degree murder, voluntary manslaughter, involuntary manslaughter, assault, and battery should here each be deemed a lesser included offense of the charged murder insofar as it was of the first degree.
 

 But, even so assuming, we cannot conclude that there was substantial evidence that Waidla was not guilty of the charged murder insofar as it was of the first degree, but was guilty instead only of second degree murder, voluntary manslaughter, involuntary manslaughter, assault, or battery.
 

 Apart from his confession, there was substantial, albeit circumstantial, evidence that Waidla was guilty of first degree murder on a theory of willful, premeditated, and deliberate murder. Simply recall that, for some appreciable period of time prior to the burglary of the Piirisilds’ North Hollywood home and the robbery of Viivi therein, Waidla had been angry with Avo and especially Viivi, had been desperate for money, and had been scheming to resolve matters in his favor. Also recall what attended the burglary and robbery, namely, the killing of Viivi, more precisely, the killing of Viivi under a sudden and devastating attack. All this amounts to evidence of the kind of motive, planning, and manner indicative of first degree murder on a theory of willful, premeditated, and deliberate murder. (Cf.
 
 People
 
 v.
 
 Anderson
 
 (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942] [dealing with the question of the sufficiency of the evidence, apparently under California statutory law, to support a conviction of first degree murder on a theory of willful, premeditated, and deliberate murder].)
 

 And, apart from his confession, there was similarly substantial, albeit circumstantial, evidence that Waidla was guilty of first degree murder on
 
 *740
 
 theories of felony-murder burglary and felony-murder robbery. Recall again his anger, desperation, and scheming, which extended back for some appreciable period of time prior to the burglary and robbery.
 

 Pointing to his confession itself, however, Waidla argues that there was substantial evidence that he was not guilty of the charged murder insofar as it was of the first degree, but was guilty instead only of second degree murder, voluntary manslaughter, involuntary manslaughter, assault, or battery. In isolation, his confession might constitute substantial evidence against first degree murder
 
 on a theory of willful, premeditated, and deliberate murder
 

 [17]
 

 Not so against first degree murder
 
 on theories of felony-murder burglary and felony-murder robbery.
 
 That is because his confession effectively admits conduct that amounts to first degree murder at least on a theory of felony-murder burglary, that is to say, the killing of Viivi in the perpetration of a burglary of the Piirisilds’ North Hollywood home, predicated on what Waidla said was an entry to steal, or more neutrally “get,” food (see generally
 
 People v. Dillon
 
 (1983) 34 Cal.3d 441, 475 [194 Cal.Rptr. 390, 668 P.2d 697] (plur. opn. of Mosk, J.);
 
 id.
 
 at p. 490 (conc. opn. of Kaus, J.)).
 

 Waidla complains that his counsel provided ineffective assistance under the Sixth Amendment’s counsel clause by failing to request instructions on second degree murder, voluntary manslaughter, involuntary manslaughter, assault, and battery as assertedly lesser included offenses of the charged murder insofar as it was of the first degree. Even if he can demonstrate deficient performance, a point on which we do not pass, he cannot demonstrate prejudice. As explained, there was not substantial evidence that would absolve him of first degree murder but not second degree murder, voluntary manslaughter, involuntary manslaughter, assault, and battery. Yet again, the People’s evidence was in sum that he was guilty as charged, whereas his evidence was in sum that he was not guilty at all. It is not reasonably probable that his counsel’s failure to request instructions on second degree murder, voluntary manslaughter, involuntary manslaughter, assault, and battery, even if professionally unreasonable, adversely affected the outcome. That is because it is not reasonably probable that any such
 
 *741
 
 request would have resulted in the giving of such instructions by the superior court and in the returning of verdicts in accordance therewith by the jury.
 
 [18]
 

 9.
 
 Exclusion of Waidla in Violation of His Right of Personal Presence
 

 A criminal defendant, broadly stated, has a right to be personally present at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; section 15 of article I of the California Constitution; and sections 977 and 1043 of the Penal Code.
 

 Waidla contends that, in violation of his right of personal presence under the cited provisions, the superior court erred by assertedly excluding him from 17 “proceedings” during the course of the trial. The “proceedings” in question involved 16 conferences at bench, outside of the presence of the jury, that related essentially to procedural, evidentiary, and housekeeping and other matters. They also involved a single conference in chambers, outside of the presence of the jury, that related to instructions.
 

 An appellate court applies the independent or de novo standard of review to a trial court’s exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court’s decision entails a measurement of the facts against the law. (See
 
 People
 
 v.
 
 Bradford
 
 (1997) 15 Cal.4th 1229, 1355-1358 [65 Cal.Rptr.2d 145, 939 P.2d 259]
 
 [semble].)
 

 After independent review, we find no error on the superior court’s part in any exclusion of Waidla from any of the 17 “proceedings” in question because we find no right on his part to be personally present.
 

 Under the Sixth Amendment’s confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent “interference with [his] opportunity for effective cross-examination.”
 
 (Kentucky v. Stincer
 
 (1987) 482 U.S. 730, 744-745, fn. 17 [107 S.Ct. 2658, 2667, 96 L.Ed.2d 631]; accord,
 
 id.
 
 at p. 740 [107 S.Ct. at p. 2664].)
 

 
 *742
 
 Similarly, under the Fourteenth Amendment’s due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a “stage . . . that is critical to [the] outcome” and “his presence would contribute to the fairness of the procedure.”
 
 (Kentucky v. Stincer, supra,
 
 482 U.S. at p. 745 [107 S.Ct. at p. 2667].)
 

 Under section 15 of article I of the California Constitution, a criminal defendant does not have a right to be personally present “either in chambers or at bench discussions that occur outside of the jury’s presence on questions of law or other matters as to which [his] presence does not bear a ‘ “ ‘reasonably substantial relation to the fullness of his opportunity to defend against the charge.’ ” ’ ”
 
 (People v. Bradford, supra,
 
 15 Cal.4th at p. 1357; accord, e.g.,
 
 People v. Jackson
 
 (1980) 28 Cal.3d 264, 308-309 [168 Cal.Rptr. 603, 618 P.2d 149] (plur. opn. of Richardson, J.).)
 

 Lastly, under sections 977 and 1043 of the Penal Code, a criminal defendant does not have a right to be personally present where he does not have such a right under section 15 of article I of the California Constitution.
 
 (People v. Bradford, supra,
 
 15 Cal.4th at p. 1357; accord, e.g.,
 
 People v. Jackson, supra,
 
 28 Cal.3d at pp. 308-309 (plur. opn. of Richardson, J.).)
 

 Having examined each of the 17 “proceedings” in question, whose general nature we have identified above, we cannot conclude with respect to any one of them that Waidla’s personal presence
 
 either
 
 was
 
 necessary
 
 for an “opportunity for effective cross-examination,” for purposes of the Sixth Amendment’s confrontation clause
 
 (Kentucky v. Stincer, supra,
 
 482 U.S. at pp. 744-745, fn. 17 [107 S.Ct. at p. 2667]);
 
 or
 
 would have “contribute[d]” to the trial’s “fairness”
 
 in any marginal way,
 
 for purposes of the Fourteenth Amendment’s due process clause
 
 (Kentucky
 
 v.
 
 Stincer, supra,
 
 482 U.S. at p. 745 [107 S.Ct. at p. 2667]);
 
 or
 
 bore a “ ‘reasonably
 
 substantial
 
 relation to the fullness of his opportunity to defend,’ ” ’ ” for purposes of section 15 of article I of the California Constitution and also sections 977 and 1043 of the Penal Code
 
 (People v. Bradford, supra,
 
 15 Cal.4th at p. 1357, italics added). The only possible basis for a conclusion favorable to Waidla in this regard would be speculation. Such a basis, however, is inadequate. (See
 
 People v. Horton
 
 (1995) 11 Cal.4th 1068, 1121 [47 Cal.Rptr.2d 516, 906 P.2d 478].)
 

 In arguing the claim, Waidla says that the 17 “proceedings” in question were “critical,” “individually” as well as “cumulatively.” To utter the words simply does not create the reality. As perhaps clearest illustration of the weakness of the point, let us comment solely on what he himself selects as “[p]erhaps the clearest illustration” of its strength. He asserts that, had he been personally present at the conference on instructions in chambers, he
 
 *743
 
 could have “nudged” his counsel, in reliance on certain statements in his confession, to request instructions on second degree murder as an offense that was lesser than, and included in, the charged murder insofar as it was of the first degree. His assertion cannot be accepted. The defense that he himself presented on the witness stand was one of alibi, nothing more and nothing less, in an effort to avoid a conviction of murder in any degree: Evidently, he desired to escape second degree murder as well as first degree murder, and was unwilling to evade the latter by falling into the former. In his testimony in support, he recanted his confession as coerced and false. To have “nudged” his counsel to request instructions on second degree murder based on his confession would have been altogether inconsistent with his own defense and his own supporting testimony. That he would actually have done so can hardly be imagined.
 
 [19]
 

 10.
 
 Prosecutorial Misconduct in Offering Factual Scenarios
 

 Waidla contends that the prosecutor committed misconduct under the Fourteenth Amendment’s due process clause by assertedly “manipulating” evidence and “skewing” argument in order to offer “ ‘mutually exclusive’ ” factual “scenarios,” one to the jury at his trial, specifically its guilt phase, and another to the jury at Sakarias’s subsequent trial: For example, at his trial, the prosecutor put forth the position that he had wielded the hatchet against Viivi Piirisild, and hence that he had inflicted the chopping blows; at Sakarias’s later trial, by contrast, the same prosecutor assertedly put forth the position that Sakarias too had wielded the hatchet, that Sakarias too had inflicted chopping blows, and that Sakarias’s chopping blows ended Viivi’s life.
 
 [20]
 

 We reject the claim at the threshold. In this cause, it is our appellate jurisdiction that we exercise. Because we do so, we cannot consider the point. “Appellate jurisdiction is limited to the four comers of the record on appeal . . . .”
 
 (In re Carpenter, supra,
 
 9 Cal.4th at p. 646.) The record on appeal embraces only Waidla’s trial. It does not extend to Sakarias’s as well. Even if it did, it would be lacking in evidence and argument bearing on the assertedly “ ‘mutually exclusive’ ’’ factual “scenarios,” and on any justification or explanation therefor. It would be lacking in such evidence and
 
 *744
 
 argument because the underlying issue was not litigated below. (See
 
 People v. Hardy
 
 (1992) 2 Cal.4th 86, 134 [5 Cal.Rptr.2d 796, 825 P.2d 781];
 
 People
 
 v.
 
 Zamora
 
 (1980) 28 Cal.3d 88, 96 [167 Cal.Rptr. 573, 615 P.2d 1361] (plur. opn. of Tobriner, J.).) As a result, it would not furnish us with a basis on which we could arrive at a resolution that we could be confident would be fair and reliable. (See
 
 People v. Hardy, supra,
 
 2 Cal.4th at p. 134.)
 

 We therefore conclude that the claim must be raised, if at all, “by petition for writ of habeas corpus”
 
 (People v. Sanchez, supra,
 
 12 Cal.4th at p. 59), which is not limited to the record on appeal’s four corners (see, e.g.,
 
 People v. Pope, supra,
 
 23 Cal.3d at pp. 426-427, fn. 17), “rather than [on] appeal” itself
 
 (People v. Sanchez, supra,
 
 12 Cal.4th at p. 59).
 

 B.
 
 Issues Relating to the Penalty of Death
 

 Waidla raises a number of claims against the imposition of the penalty of death. As will appear, none is meritorious.
 

 1.
 
 Ineffective Assistance of Counsel
 

 Waidla contends that his'counsel provided ineffective assistance under the Sixth Amendment’s counsel clause by failing to attempt to introduce, for mitigation, evidence of a portion of a confession that Sakarias assertedly made to the police, which was assertedly admitted at Sakarias’s later trial.
 

 We reject the claim at the threshold. The record on appeal does not include any confession by Sakarias. Therefore, we conclude that the point must be raised, if at all, by petition for writ of habeas corpus rather than on appeal.
 

 2.
 
 Prosecutorial Misconduct in Offering Factual Scenarios
 

 Waidla contends that the prosecutor committed misconduct under the Fourteenth Amendment’s due process clause by assertedly “manipulating” evidence and “skewing” argument in order to offer “ ‘mutually exclusive’ ” factual “scenarios,” one to the jury at his trial, specifically its penalty phase, and another to the jury at Sakarias’s subsequent trial: For example, at his trial, the prosecutor put forth the position that he dominated Sakarias, that he wielded the hatchet against Viivi Piirisild, and hence that he inflicted the chopping blows; at Sakarias’s later trial, by contrast, the same prosecutor assertedly put forth the position that he did not dominate Sakarias, that
 
 *745
 
 Sakarias too had wielded the hatchet, that Sakarias too had inflicted chopping blows, and that Sakarias’s chopping blows ended Viivi’s life.
 
 [21]
 

 As we did with regard to its counterpart, we reject this claim too at the threshold, and conclude that it must be raised, if at all, by petition for writ of habeas corpus rather than on appeal. (See
 
 ante,
 
 at p. 744.)
 

 3.
 
 Response to Jury Request for Instructions Regarding Inability to Reach a Verdict
 

 The jury deliberated on the question of penalty over nine court days. On the third day, it sent a note to the superior court requesting “instructions regarding a jury who cannot come to a unanimous decision in the penalty phase”; the superior court directed its bailiff, to whose role as messenger the People and Waidla stipulated, to inform the jury on its behalf that “there are no instructions regarding a jury who cannot come to a unanimous decision in the penalty phase”; the bailiff, presumably, informed the jury as the superior court had directed him to. On the fifth day, the jury sent a note to the superior court stating that it was deadlocked and was unable to reach a unanimous verdict; summoning the jury into open court, the superior court polled each juror as to whether he believed that there was .-a reasonable probability that the jury would reach a unanimous verdict if it continued to deliberate, received one “yes,” 10 “noes,” and one “not sure,” and then asked the jury to resume its deliberations, commenting that the “issue which you are to decide is a very difficult issue because it involves intense moral reflection.” On the ninth day, the jury returned the verdict of death.
 

 Waidla contends that the superior court erred by effectively refusing to instruct the jury as it deliberated in response to its request that, under California statutory law, if a jury “has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be. If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole” (Pen. Code, § 190.4, subd. (b)).
 

 An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its
 
 *746
 
 exercise of its supervision over a deliberating jury. (Cf. 2 Childress & Davis, Federal Standards of Review,
 
 supra,
 
 Trial Judge: Supervision and Discretion, § 11.33, pp. 11-127 to 11-129 [stating that abuse of discretion is the federal standard of review for a decision whether or not to give a so-called
 
 “Allen”
 
 charge
 
 (Allen
 
 v.
 
 United States
 
 (1896) 164 U.S. 492 [17 S.Ct. 154, 41 L.Ed. 528]) to a deadlocked jury].)
 

 Employing that test, we find no error. It was not at all unreasonable for the superior court effectively to refuse to instruct the jury as it deliberated in response to its request, which went to the consequences of a jury’s inability to reach a unanimous verdict as to penalty. As the superior court itself commented, the choice between death and life imprisonment without possibility of parole that is demanded of a jury after the penalty phase as its fundamental and ultimate act is “very difficult. . . . because it involves intense moral reflection.” An instruction of the sort refused, if given, might disturb the task and invite its avoidance, having as it does a “potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process”
 
 (People
 
 v.
 
 Belmontes
 
 (1988) 45 Cal.3d 744, 814 [248 Cal.Rptr. 126, 755 P.2d 310]; accord, e.g.,
 
 People
 
 v.
 
 Hines
 
 (1997) 15 Cal.4th 997, 1075 [64 Cal.Rptr.2d 594, 938 P.2d 388]; cf.
 
 Jones
 
 v.
 
 United States
 
 (1999) 527 U.S. 373, 382 [119 S.Ct. 2090, 2099, 144 L.Ed.2d 370] [implying as much for a jury at the so-called “selection phase” of a federal capital trial, which is similar to the penalty phase here].) The proper focus of the jury’s deliberations is which penalty to choose, and not whether to make the choice in the first place. We recognize that, under California statutory law, a trial court is required to instruct a deliberating jury on its request “on any point of law arising in the case.” (Pen. Code, § 1138.) But it is not required so to instruct on any “point of law” merely associated therewith. The consequences of a jury’s inability to reach a unanimous verdict as to penalty is a point of the latter kind and not the former. (Cf.
 
 Jones v. United States, supra,
 
 527 U.S. at p. 382 [119 S.Ct. at p. 2099] [implying as much for a jury at the selection phase of a federal capital trial: the consequences of a jury’s inability to reach a unanimous verdict as to penalty “has no bearing on [its] role in the sentencing process”].) To repeat: The proper focus of a jury’s deliberations as to penalty is which penalty to choose, and not whether to make the choice in the first place.
 

 Waidla argues against our conclusion. We agree that, as a general matter, the superior court
 
 may
 
 instruct a deliberating jury in response to a request going to the consequences of its inability to reach a unanimous verdict as to penalty. (See
 
 People v. Belmontes, supra,
 
 45 Cal.3d at p. 814
 
 [semble].)
 
 But we cannot agree that, in this cause, the superior court
 
 had
 
 to do so, whether
 
 *747
 
 under the compulsion of the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment;
 
 [22]
 
 the due process clause of the Fifth Amendment, as applied to the states through the due process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; or otherwise. Waidla asserts that the superior court was required to act in order to dispel a concern by the jury that its inability to reach a unanimous verdict as to penalty might undermine its verdicts and findings as to guilt or, at least, result in a sentence of some term of imprisonment that might in fact allow parole. Any such concern, however, is solely a matter of speculation, and is altogether without basis in the record on appeal. The superior court was not obligated to act in the premises. Waidla says that its effective refusal to instruct “derail[ed]” the jury as it deliberated. Quite the opposite. It kept it on track.
 

 4.
 
 Denial of Automatic Application for Modification of the Verdict of Death
 

 California statutory law provides for an automatic application to the superior court for modification of any verdict of death returned by a jury. (Pen. Code, § 190.4, subd. (e).) As a matter of substance, it requires the superior court, in making its ruling, to “review the evidence” (ibid.)— meaning
 
 all
 
 the evidence (see
 
 People v. Edwards
 
 (1991) 54 Cal.3d 787, 847 [1 Cal.Rptr.2d 696, 819 P.2d 436]), and
 
 only
 
 the evidence
 
 (People
 
 v.
 
 Jennings
 
 (1988) 46 Cal.3d 963, 995 [251 Cal.Rptr. 278, 760 P.2d 475]),
 
 presented to the jury (People
 
 v.
 
 Williams
 
 (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221]); to “consider, take into account, and be guided by” specified “aggravating and mitigating circumstances” referred to therein (Pen. Code, § 190.4, subd. (e)); and, thereupon, to “make a determination as to whether” the verdict in question is “contrary” to the “law” or the “evidence”
 
 (ibid.).
 
 As a matter of form, it requires the superior court, in issuing its ruling, to “set forth” its “reasons” therefor and “direct that they be entered on the Clerk’s minutes”
 
 (ibid.);
 
 and also to “state on the record the reasons for” any “findings” that it may make
 
 (ibid.).
 

 After a hearing, the superior court denied Waidla’s automatic application for modification of the verdict of death.
 

 Waidla contends that the superior court erred thereby.
 

 
 *748
 
 In part, Waidla’s claim is that, in denying his verdict-modification application, the superior court erred under California statutory law.
 

 In this part, we reject the claim on the merits. An appellate court applies the independent or de novo standard of review to a trial court’s granting or denial of a verdict-modification application. (E.g.,
 
 People
 
 v.
 
 Alvarez, supra,
 
 14 Cal.4th at p. 244.) Employing that test, we find the superior court’s denial of Waidla’s application sound. By all indications, it did what it was required to do. That is to say, it effectively reviewed all the evidence, and only the evidence, presented to the jury—notwithstanding Waidla’s assertions and suggestions to the contrary; it considered, took into account, and was guided by the aggravating and mitigating circumstances; it made a determination that the verdict in question was not contrary to the law or the evidence; it set forth its reasons for its consequent denial of the application, and directed their entry in the clerk’s minutes; and it stated on the record the reasons for various findings that it made.
 

 In other part, Waidla’s claim is that, in denying his verdict-modification application, the superior court erred under the United States Constitution, including the Eighth Amendment’s cruel and unusual punishments clause and the Fourteenth Amendment’s due process clause.
 
 [23]
 
 Its gist is that, in denying his application and in subsequently denying Sakarias’s
 
 (People
 
 v.
 
 Sakarias, supra,
 
 22 Cal.4th at pp. 608-609), the superior court assertedly made “mutually exclusive” findings: For example, in denying his application, the superior court found that he actually killed, and intended to kill, Viivi Piirisild, that he wielded the hatchet, and hence that he inflicted the chopping blows; in denying Sakarias’s later application, by contrast, the superior court, through the same judge, assertedly found that Sakarias actually killed, and intended to kill, Viivi, that Sakarias too wielded the hatchet, and that Sakarias in fact inflicted the two evidently peri- or postmortem chopping blows.
 

 In this part, we reject the claim at the threshold. We have proceeded thus as to the claims of prosecutorial misconduct. (See
 
 ante,
 
 at pp. 743-744 & 744-745.) We shall do the same as to this part of the present claim, which is effectively based thereon.
 
 [24]
 
 Apart from the asserted “manipulat[ionj” of evidence and “skewing” of argument by the prosecutor in order to offer “ ‘mutually exclusive’ ” factual “scenarios” at Waidla’s trial and at Sakarias’s subsequent one, the superior court’s assertedly “mutually exclusive”
 
 *749
 
 findings would not be problematic in and of themselves. As stated, in making its ruling on a verdict-modification application, the superior court must review only the evidence presented to the jury at the trial in question. The evidence that was presented to the jury at Waidla’s trial might prove different from the evidence that would subsequently be presented to the jury at Sakarias’s later trial. Therefore, the findings that the superior court made in denying Waidla’s application might be different from the findings that it would subsequently make in denying Sakarias’s later application. We conclude that this part of the claim must be raised, if at all, by petition for writ of habeas corpus rather than on appeal. (See
 
 ante,
 
 at pp. 744 & 745.)
 
 [25]
 

 IV.
 
 Disposition
 

 Having found no reason to do otherwise, we conclude that we must affirm the judgment.
 

 It is so ordered.
 

 George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.
 

 Appellant’s petition for a rehearing was denied June 14, 2000.
 

 [1]
 

 Waidla has represented that he has “separately fil[ed],” or perhaps would separately file, a “request" for judicial notice of the record on appeal in Sakarias’s cause. He has apparently failed to do so. Treating his representation as a request, however, we deny it nonetheless. Judicial notice of the record there would “improperly augment” the record here.
 
 (People v. Sanchez
 
 (1995) 12 Cal.4th 1, 59, fn. 5 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)
 

 Prior to oral argument, Waidla made a motion for us to consolidate the proceedings involving this appeal and those involving a petition for writ of habeas corpus that he had submitted. We denied that request. At oral argument, he made another such motion. We deny this request as well. The premise of each of his submissions is that consolidation is necessary for consideration and decision of his appeal and his habeas corpus petition
 
 inter se.
 
 It is unfounded. An appeal is “limited to the four comers of the [underlying] record on appeal ....’’
 
 (In re Carpenter
 
 (1995) 9 Cal.4th 634, 646 [38 Cal.Rptr.2d 665, 889 P.2d 985].) Habeas corpus is not. (See, e.g.,
 
 People
 
 v.
 
 Pope
 
 (1979) 23 Cal.3d 412, 426-427, fn. 17 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Hence, consolidation is not necessary for consideration and decision of his appeal
 
 vis-á-vis his habeas corpus petition.
 
 Indeed, it is inappropriate, inasmuch as the habeas corpus petition extends far beyond the record on appeal. Neither is consolidation necessary for consideration and decision of his habeas corpus petition
 
 vis-á-vis his appeal.
 
 The habeas corpus petition is not confined to the record on appeal.
 

 [2]
 

 Waidla claims that the superior court’s “erroneous” denial of his motion to conduct the voir dire of the prospective jurors concerning their views on the death penalty individually and in sequestration, in accordance with
 
 Hovey,
 
 “deprived” him of “due process and a fair and impartial jury . . . .” As explained in the text, the ruling was in fact not erroneous.
 

 To the extent that Waidla claims generally and broadly that the superior court erred by conducting an assertedly “inadequate” voir dire of the prospective jurors, the record on appeal is otherwise.
 

 [3]
 

 Again, to the extent that Waidla claims generally and broadly that the superior court erred by conducting an assertedly “inadequate” voir dire of the prospective jurors, the record on appeal is otherwise. (See
 
 ante,
 
 at p. 714, fn. 2.)
 

 [4]
 

 Waidla claims, in substance, that, in its ruling on the admissibility of Rita’s testimony about his desire to get money without working, the superior court erred under the United States Constitution as well as California statutory law—specifically, under the free speech and peaceable assembly clauses of the First Amendment, as applied to the states through the due process clause of the Fourteenth Amendment; the impartial jury trial and confrontation clauses of the Sixth Amendment, each as applied to the states through the due process clause of the Fourteenth Amendment; and the due process clause of the Fourteenth Amendment itself. This point, too, he has not preserved for review. As to none of such grounds did he satisfy the general rule, which we find applicable here, requiring specific and timely objection.
 

 [5]
 

 Including a stipulation like the one that the superior court had considered “forcing]” the People to enter into.
 

 We have observed that the “general rule is that” the People “cannot be compelled to accept a stipulation if the effect would be to deprive” their “case of its persuasiveness and forcefulness.”
 
 (People v. Edelbacher
 
 (1989) 47 Cal.3d 983, 1007 [254 Cal.Rptr. 586, 766 P.2d 1] (lead opn. of Kaufman, J.); accord,
 
 People
 
 v.
 
 Arias
 
 (1996) 13 Cal.4th 92, 131 [51 Cal.Rptr.2d 770, 913 P.2d 980].) The superior court effectively determined that such would have been the effect. As a decision relating to the admissibility of evidence, it should be subject to review on appeal for abuse of discretion. As a decision that was not unreasonable, it survives such scrutiny.
 

 [6]
 

 We note in passing that, in
 
 People v. Mickey
 
 (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84], we held that a trial court, in making a determination whether certain evidence is substantially more prejudicial than probative, “need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so . . . .” But, in other earlier decisions, as enumerated by the Court of Appeal in
 
 People v. Triplett
 
 (1993) 16 Cal.App.4th 624, 626-629 [20 Cal.Rptr.2d 225], we used language not entirely consistent with this holding. For example, in
 
 People v. Farmer
 
 (1989) 47 Cal.3d 888, 906 [254 Cal.Rptr. 508, 765 P.2d 940], we stated that the “court must affirmatively articulate the fact that it has weighed probative value against prejudice,” and that it must make the “weighing . . . explicit in the record.” After review, the
 
 Triplett
 
 court concluded that it is
 
 Mickey
 
 that “accurately reflects the current rule . . . .”
 
 (People v. Triplett, supra,
 
 16 Cal.App.4th at p. 628.) It was right to do so. Any language in any decisions of ours to the contrary is no longer vital.
 

 [7]
 

 A belief that we do not think it reasonably likely (see
 
 People
 
 v.
 
 Clair, supra,
 
 2 Cal.4th at pp. 662-663) that the jury shared. In his summation, the prosecutor did indeed argue planning and execution. But he had other evidence to use for that purpose.
 

 [8]
 

 Waidla claims, in substance, that, in its rulings on the admissibility of the testimony of Rita, Avo, and Special Agent Charon about statements by Viivi declaring and/or circumstantially indicating her fear of him and Sakarias, the superior court erred under the United States Constitution as well as California statutory law—specifically, under the confrontation clause of the Sixth Amendment, as applied to the states through the due process clause of the Fourteenth Amendment. He has not preserved this point for review. He did not satisfy the general rule, which we find applicable here, requiring specific and timely objection. He cites his counsel’s comments about his inability to “cross-examine” Viivi. In another cause, “bare reference to the ‘confrontation rule’ . . . was not enough.”
 
 (People v. Alvarez, supra,
 
 14 Cal.4th at p. 186.) In this one, bare reference to an inability to “cross-examine” is even more insufficient. All the same, “where . . . hearsay . . . come[s] within a firmly rooted exception . . . , the Confrontation Clause is satisfied.”
 
 (White v. Illinois
 
 (1992) 502 U.S. 346, 356 [112 S.Ct. 736, 743, 116 L.Ed.2d 848].) State of mind is one such exception. (See
 
 People v. Majors
 
 (1998) 18 Cal.4th 385, 405 [75 Cal.Rptr.2d 684, 956 P.2d 1137];
 
 People v. Morales
 
 (1989) 48 Cal.3d 527, 552 [257 Cal.Rptr. 64, 770 P.2d 244].) To the extent that Waidla claims that the superior court erred under the confrontation clause of section 15 of article I of the California Constitution, he does so perfunctorily. We reject the point in the same fashion.
 
 (People v. Ashmus, supra,
 
 54 Cal.3d at p. 1011, fn. 29.)
 

 Waidla also claims, in substance, that, in the rulings identified above, the superior court erred under the United States and California Constitutions as well as California statutory law—specifically, the due process clause of the Fourteenth Amendment and the due process clauses of subdivision (a) of section 7 and section 15 of article I of the California Constitution. This point, too, he has not preserved for review. He did not satisfy the general rule, which we find applicable here, requiring specific and timely objection.
 

 [9]
 

 In mating his motion, Waidla stated that he would rely on, among other things, the “transcript of the preliminary hearing,” which preceded the presentation of the information. It turned out, however, that he apparently did not do so, relying instead on what transpired at the evidentiary hearing. At that hearing, it may be noted, the People proposed to the superior court that they and Waidla “could agree to move testimony from the preliminary hearing” into evidence. The superior court declined, stating, “I think this is a lot more complete.”
 

 [10]
 

 Compare
 
 Oregon
 
 v.
 
 Bradshaw, supra,
 
 462 U.S. at pages 1045-1046 [103 S.Ct. at page 2835] (plur. opn. of Rehnquist, J.) (concluding that, by asking, “ ‘Well, what is going to happen to me now?,’ ” the defendant therein “evinced a willingness and a desire for a generalized discussion about the investigation”).
 

 [11]
 

 Waidla claims that he was “deprived of due process, his privilege against self-incrimination, and his right to counsel. . . .” In doing so, he merely restates his point that the superior court erred by denying his motion, and did so reversibly. But, as explained in the text, the superior court did not err at all.
 

 [12]
 

 In
 
 People
 
 v.
 
 Tufunga
 
 (1999) 21 Cal.4th 935, 938-939 [90 Cal.Rptr.2d 143, 987 P.2d 168], we overruled
 
 Butler
 
 to the extent that it covers, among others, a perpetrator who attempts to collect on a debt, limiting it instead to the perpetrator who merely seeks to effect what he believes in good faith to be the recovery of specific items of his own personal property. The overruling and limiting of
 
 Butler
 
 is of no import here.
 

 [13]
 

 Compare
 
 People v. Barnett, supra,
 
 17 Cal.4th at page 1145 (noting that the perpetrator therein “simply seized whatever items of value” were available “without any regard to whether such items came from” the person “who supposedly owed him a debt, or from one of’ certain “others” there present, “who indisputably did not”);
 
 People v. Alvarado
 
 (1982) 133 Cal.App.3d 1003, 1022 [184 Cal.Rptr. 483] (noting that the perpetrators therein “conducted a general ransacking” of certain premises, “indiscriminately taking items of value never specifically related to any claim of right”).
 

 [14]
 

 We observe that, in his summation, the prosecutor commented that Waidla acted with a “motive”: “The motive consists of the fact that. . . Waidla had no money at that time, he had come a long way for property he believed was his,” that is, Avo’s Triumph or its worth in cash, “and he believed that he was not going to get the property.” Through this remark, the prosecutor apparently conceded that, at least prior to the charged burglary and robbery, Waidla may have had a “bona fide belief’ of a “right or claim”
 
 (People v. Butler, supra,
 
 65 Cal.2d at p. 573) to the vehicle or its value. But he surely did
 
 not
 
 concede that, in committing the burglary and robbery, Waidla acted on any such belief in taking what he actually took.
 

 [15]
 

 Waidla broadly claims that, by failing to instruct the jury sua sponte on trespass and assault as assertedly lesser included offenses of the charged burglary and robbery, respectively, the superior court erred under the impartial jury trial clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment, and under the due process clause of the Fourteenth Amendment itself, and also under the analogous provisions of subdivision (a) of section 7, section 15, and section 16 of article I of the California Constitution. The point rests on the asserted existence of error under California decisional law. But, in light of the analysis in the text, it rests on nothing.
 

 Waidla claims more narrowly that, by failing to instruct the jury sua sponte on trespass and assault as assertedly lesser included offenses of the charged burglary and robbery, respectively, the superior court erred under the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment, and under the due process clause of the Fourteenth Amendment itself, as both are construed in
 
 Beck
 
 v.
 
 Alabama
 
 (1980) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392], In
 
 Beck,
 
 the court, as it stated in
 
 Hopkins
 
 v.
 
 Reeves
 
 (1998) 524 U.S. 88, 90 [118 S.Ct. 1895, 1897, 141 L.Ed.2d 76], “held unconstitutional a state statute that prohibited lesser included offense instructions in capital cases, when lesser included offenses to the charged crime existed under state law and such instructions were generally given in noncapital cases.” “The goal of the
 
 Beck
 
 rule,” as the court said in
 
 Spaziano
 
 v.
 
 Florida
 
 (1984) 468 U.S. 447, 455 [104 S.Ct. 3154, 3159, 82 L.Ed.2d 340], and as it said again in
 
 Schad v. Arizona
 
 (1991) 501 U.S. 624, 646-647 [111 S.Ct. 2491, 2505, 115 L.Ed.2d 555], “is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence”—“capital murder” meaning murder that legally “require[s]” the jury “to impose the death penalty”
 
 (Beck v. Alabama, supra,
 
 447 U.S. at p. 629 [100 S.Ct. at p. 2385]).
 
 Beck
 
 is distinguishable on its facts. Here, there was no California statute or law of any kind that prohibited instructions on lesser included offenses in capital cases but not in noncapital ones: To quote
 
 Hopkins,
 
 California has not “erected an ‘artificial barrier’ that restrict[s] its juries to a choice between conviction for a capital offense and acquittal.”
 
 (Hopkins
 
 v.
 
 Reeves, supra,
 
 524 U.S. at p. 96 [118 S.Ct. at p. 1900].) Moreover, the
 
 Beck
 
 rule is not implicated in its purpose. Here, Waidla’s jury was not forced into an all-or-nothing choice between a conviction of murder that would legally compel it to fix the penalty at death, on the one side, and innocence, on the other: Even if it found him guilty of first degree murder on theories of both felony-murder burglary and felony murder robbery under both the felony-murder-burglary and felony-murder-robbery special circumstances, it was not legally compelled to fix the penalty at death, but could fix it instead at a term of imprisonment for life without possibility of parole. Furthermore, it could have found him guilty of first degree murder on a theory of willful, premeditated, and deliberate murder under no special circumstances-—-a result that would have precluded any exposure to the death penalty whatsoever.
 

 To the extent that Waidla claims that the superior court erred under any law by failing to instruct the jury sua sponte on, apparently, brandishing a deadly weapon and being an accessory to a felony as assertedly lesser related offenses of the charged burglary and/or robbery, he does so perfunctorily, and we reject the point in the same fashion. Similarly, to the extent that Waidla claims that the superior court erred under any law by failing to “identify” and “describe” the “target” offenses for which he might be liable as an aider and abettor under the “ ‘natural and probable consequences’ doctrine”
 
 (People
 
 v.
 
 *737
 

 Prettyman
 
 (1996) 14 Cal.4th 248, 254 [58 Cal.Rptr.2d 827, 926 P.2d 1013]), he does so perfunctorily, and we reject the point in the same fashion.
 

 [16]
 

 The claims of instructional error under, inter alia, the United States and California Constitutions that Waidla raises with respect to trespass and assault as assertedly lesser included offenses of the charged burglary and robbery, respectively (see
 
 ante,
 
 at pp. 736-737, fn. 15), also extend to theft as a lesser included offense of the charged robbery. They are rejected for the reasons stated (see
 
 ibid.),
 
 which are applicable here as well as there.
 

 [17]
 

 Contrary to Waidla’s assertion, his confession could
 
 not
 
 constitute substantial evidence
 
 in favor of voluntary manslaughter.
 
 He invites our attention to the fact that voluntary manslaughter is committed “upon a sudden quarrel or heat of passion” (Pen. Code, § 192, subd. (a)). We invite his to the fact that “sudden quarrel or heat of passion” requires provocation that is adequate to arouse a reasonable person (e.g.,
 
 People v. Valentine
 
 (1946) 28 Cal.2d 121, 136-144 [169 P.2d 1]). There was no evidence whatsoever that Viivi so provoked Waidla as adequately to arouse a reasonable person to make the kind of sudden and devastating attack that he participated in making.
 

 [18]
 

 The claims of instructional error under, inter alia, the United States and California Constitutions that Waidla raises with respect to trespass and assault as assertedly lesser included offenses of the charged burglary and robbery, respectively (see
 
 ante,
 
 at pp. 736-737, fn. 15), also extend to second degree murder, voluntary manslaughter, involuntary manslaughter, assault, and battery as assertedly lesser included offenses of the charged murder insofar as it was of the first degree. They are rejected for the reasons stated (see
 
 ibid.),
 
 which are applicable here as well as there.
 

 [19]
 

 Waidla claims that he was “deprived of due process, a fair trial, and his right of presence . ...” In doing so, he merely restates his point that the superior court erred by assertedly excluding him from the 17 “proceedings" in question, and did so reversibly. But, as explained in the text, the superior court did not err at all.
 

 [20]
 

 Although, in label, Waidla’s claim impliedly refers to the due process clauses of subdivision (a) of section 7 and section 15 of article I of the California Constitution as well as the due process clause of the Fourteenth Amendment to the United States Constitution, in substance it expressly rests only on the latter.
 

 [21]
 

 Although, in label, this claim too impliedly refers to the due process clauses of subdivision (a) of section 7 and section 15 of article I of the California Constitution as well as the due process clause of the Fourteenth Amendment to the United States Constitution, in substance it expressly rests only on the latter. (See
 
 ante,
 
 at p. 743, fn. 20.)
 

 [22]
 

 Compare
 
 Jones
 
 v.
 
 United States, supra,
 
 527 U.S. at page 382 [119 S.Ct. at page 2099] (rejecting a claim of error based on a trial court’s refusal to instruct the jury in its charge at the selection phase of a federal capital trial on the consequences of a jury’s inability to reach a unanimous verdict as to penalty: the “Eighth Amendment [does not] require[] a jury be instructed as to the consequences of a breakdown in the deliberative process”).
 

 [23]
 

 Even though this part of Waidla’s claim makes passing mention of the California Constitution, specifically, the due process clauses of subdivision (a) of section 7 and section 15 of article I and the cruel or unusual punishment clause of section 17 of article I, it does not rest thereon.
 

 [24]
 

 Contrary to Waidla’s charges, we cannot discover in the record on appeal any expression or implication by the superior court of any bias, either in fact or in appearance.
 

 [25]
 

 In denying Waidla’s verdict-modification application, the superior court, as stated in the text, found that he actually killed, and intended to kill, Viivi Piirisild. It did so beyond a reasonable doubt. Whether or not such a degree of certitude is necessary (see
 
 Hopkinson
 
 v.
 
 Shillinger
 
 (10th Cir. 1989) 866 F.2d 1185, 1214 [assuming to the affirmative]), it is obviously sufficient, since none higher is demanded by the law. Having reviewed the record on appeal, we conclude that the superior court’s findings on actual killing and intent to kill are supported by substantial evidence, and must therefore be sustained. (See, e.g.,
 
 People v. Alvarez, supra,
 
 14 Cal.4th at p. 247, fn. 45.) Accordingly, we further conclude that the superior court’s imposition of the sentence of death on Waidla does not violate the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution, on the separate and independent grounds, each of which is adequate in and of itself, that he actually killed and also intended to kill.
 
 (Cabana v. Bullock
 
 (1986) 474 U.S. 376, 386 [106 S.Ct. 689, 697, 88 L.Ed.2d 704].)